**SCHOENHEIT et al. v. LUCAS, Commissioner of Internal Revenue (three cases).**

Nos. 2955, 2956, 2973.

Circuit Court of Appeals, Fourth Circuit.

Oct. 21, 1930.

Julius C. Martin, of Asheville, N. C., for petitioners.

Andrew D. Sharpe, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch and Sewall Key, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, and De Witt M. Evans, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before PARKER, Circuit Judge, and GRONER and SOPER, District Judges.

SOPER, District Judge.

This group of three cases may be most conveniently considered in a single opinion because all of them relate to the legal effect of certain transactions of Karl Von Ruck, late of Asheville, N. C., deceased, during the closing years of his life. Federal income taxes for the years 1919, 1920, and 1921, and the federal estate tax which became payable by reason of his death on November 5, 1922, are involved.

The first case, No. 2955, concerns a deficiency assessment by the Commissioner of Internal Revenue for the income tax for the year 1919, arising by reason of the failure of Von Ruck to include in his income: (a) A profit of $140,619.25, alleged to have been received by him in the exchange of certain real estate in and near Asheville, N. C., for certain stock of the Spray Cotton Mills, a corporation of which he was the sole stockholder; and (b) a salary of $1,000 per month for the last nine months of the year 1919 alleged to have been received by him from the Von Ruck Memorial Sanitarium, Inc., a nonstock corporation whose activities he directed.

Karl Von Ruck was an accomplished German physician, who for a long time had resided at Asheville, N. C., and had conducted in that city the Winyah Sanitarium, an institution for tubercular patients. Some time prior to 1918, he retired from active practice, and leased his sanitarium to his son, an only child, who continued its operations until he died in that year. About the same time, the only child of the son also died, and Von Ruck was left without descendants. Thereupon he again resumed his professional activities and was so engaged until the time of his death on November 5, 1922, at the age of seventy-three. In the year 1919, he disposed of several pieces of real estate which he had acquired, by conveying them to a corporation which he owned, so that it became vested with title to the larger part, if not all, of his assets; and it was his apparent purpose to make easy distribution of a large part of his estate to various collateral relatives and friends in the United States and Germany. Subsequently he carried this purpose into effect, and the questions which arise in these cases largely revolve around these transactions.

Dr. Von Ruck was also interested in the manufacture of cotton. He was the president and sole stockholder of the Spray Cotton Mills, a North Carolina corporation, engaged in business at Spray, N. C., having outstanding 4,000 shares of stock of the par value of $100 each. He had gradually acquired all of this stock during the period from 1897 to 1915. He was also the owner of valuable real estate which consisted of the hospital for tubercular persons, with 20 acres of land adjoining, a residence and 20 acres of land adjoining, a farm of 140 acres, and in addition some odd lots in the neighborhood of the sanitarium. All of this real estate was located in or near the city of Asheville. On July 1, 1919, he caused the capital stock of the Spray Cotton Mills to be increased to 10,000 shares of a par value of $100 each, and conveyed to the corporation the real estate described in exchange for the 6,000 shares of newly issued common stock together with $75,000 in cash or cash credits.

It is stipulated in the case that all of the real estate involved in this transfer had been acquired by deed prior to March 1, 1913, and that its value on that day was $534,380.75. The Commissioner contended, and the Board of Tax Appeals held, that the fair market value of the property transferred and the stock and credit of the corporation exchanged therefor was $675,000, and that consequently the decedent realized a taxable gain in the transaction of $140,619.25; and hence that this sum should have been included by Von Ruck in his income tax return for the calendar year 1919. The evidence showed that there had been no sales of the stock of the corporation since the year 1915, when Von Ruck purchased the last block of stock outstanding at par. The Board therefore had no evidence of sales from which the value of the stock in 1919 could be determined. It did refer in its opinion to the fact that the corporation had made substantial earnings during the four years from 1916 to 1919 as follows: $109,763.32, $102,423.69, $75,751.36, and $183,784.13; and the findings show that before the issue of the additional $600,000 of stock, the book value was $212, and after the issue, $157.33 per share. But the Board did not base its valuation upon the assets of the manufacturing corporation or on the earnings thereof, but arrived at its conclusions in the following manner (see 14 B. T. A. 33):

"The method of determining the value of stock issued in exchange for property has been considered by the Board in Appeal of William Ziegler, Jr., 1 B. T. A. 186–192, where we held:

"The usual method of appraising stock issued for property where there is no evidence of the market value of the stock is to say that the stock is deemed equivalent in value to the property for which it was issued, and by determining the value of the property one can determine the value of the stock.

"In the instant case we are of the opinion that the fair market value of the property transferred was $675,000. Applying the rule laid down in the Ziegler appeal, the fair market value of the Spray Cotton Mills stock exchanged therefor is the same amount. This is the figure used by the respondent and the petitioners have offered no proof that convinces us that the fair market value of the stock was in a different amount than that here found. See also Appeal of Napoleon B. Burge, et al., 4 B. T. A. 732."

We have then to determine whether the record contains evidence to support the Board's findings of fact under the rule laid down in Atlantic Coast Distributors v. Commissioner (C. C. A.) 33 F.(2d) 733; and whether the taxpayer made a gain or profit which formed a part of his taxable income for the year 1919. The Revenue Act of 1918, c. 18, 40 Stat. 1057, amongst other things provides:

"Sec. 202 (a) That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—

"(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; and

"(2) In the case of property acquired on or after that date, the cost thereof; or the inventory value, if the inventory is made in accordance with section 203.

"(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any. * * *" 40 Stat. 1060.

Section 202(b) lays down the rule applicable to the exchange of property and makes it necessary to determine the fair market value, if any, of the property received. The Board's valuation of the stock was based on its opinion of the fair market value of the real estate which it declared to be $675,000. Was there any substantial evidence to support this estimate? That the property was of large value, the stipulation that on March 1, 1913, it was worth $534,380.75, abundantly shows. On the other hand, the estimate that it had advanced in value to the amount of $140,619.25 by July 1, 1919, rests entirely upon the valuation placed upon it by the parties to the transfer of that date; and when we recall that these parties resolve themselves into the single personality of Von Ruck, who was in effect at one and the same time both the buyer and the seller of the real estate, that valuation loses much of its probative force. Von Ruck's figures were accepted in the exchange as a matter of course, for he had not only the power but the will to run the business of the corporation substantially as if it were his own. He reached his valuation by taking the original cost of the property and adding thereto 6 per cent. per annum, together with the outlay for improvements, taxes and assessments, and deducting therefrom the income during the period of ownership. Much of the property was unproductive. Indeed, the sanitarium, whose earning power depended largely upon the

personal efforts and reputation of Dr. Von Ruck, was the only revenue-producing property. Upon this a rental of $2,000 per month had been placed during the regime of his son. There was uncontradicted evidence that a valuation of $250,000 upon the sanitarium and $96,000 on the residence, placed by Von Ruck at the time of the transfer, was grossly inflated. These circumstances contribute to make an affirmative answer to the inquiry whether the evidence was sufficient to justify the Board's finding of fact a matter of some difficulty, even when the finality of such a finding under the law is taken into account.

But we need not decide whether there was evidence tending to show that the real estate was worth $675,000, or whether it was proper to ignore the other assets which the corporation owned both before and after the transfer, in determining the value of the new stock; for even if it be assumed that the value of the shares was correctly ascertained, it is clear that Von Ruck made no profit out of the transaction. At bottom, the inquiry is whether the change made by the taxpayer in the technical ownership of his property created taxable income separated from his original capital investment. The Supreme Court of the United States has declared in several cases that in determining what constitutes income, substance rather than form is to be given controlling weight, Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570; Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520; Bowers v. Kerbaugh-Empire Co., 271 U. S. 170, 173, 46 S. Ct. 449, 70 L. Ed. 886; and that court, in considering cases of corporate organization in which an exchange of stock in an old for stock in a new corporation has been made, has shown how difficult it is to determine whether the shareholder in any given case has received something different from what he had before, or has merely changed the form of his holdings without actual realization of gain. Compare Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079, and Weiss v. Stearn, supra.

In a number of cases, involving the transfer of individual or family properties to a close corporation in exchange for stock, it has been held that the change was one of form rather than of substance, and that the stockholder in effect got nothing which he did not already have. See Bourn v. McLaughlin (D. C.) 19 F.(2d) 148; Tsivoglou v. United States (D. C.) 27 F.(2d) 564; Id. (C. C. A.) 31 F.(2d) 706; Heafey v. Allen (D. C.) 34 F.(2d) 941. Such a statement is certainly true of a transfer like the present one, affecting only the interests of a single person who was the owner of the property transferred to the corporation and at the same time the sole owner of the corporation whose stock was given in exchange. In Safe Deposit & Trust Co. v. Miles (D. C.) 273 F. 822, 824, affirmed 259 U. S. 247, 42 S. Ct. 483, 66 L. Ed. 923, a case which arose under the Income Tax Act of 1916 (39 Stat. 756), Judge Rose said: "Nevertheless, by and large, the statute means what it says, and that is that the tax is to be levied on nothing else except gains, profits, and income, and upon them only when actually realized in money or in money's worth." We are satisfied that in this transaction no such realization of profit was had.

The uncontradicted evidence in this case shows not only that there was no gain or profit available to the taxpayer after the transfer, which was not available to him before, but on the contrary that the assembly of all of the taxpayer's property into the hands of the corporation made it more difficult for him to reduce his holdings to cash. Witnesses, familiar with stock transactions in general and with cotton mill properties in particular, testified without contradiction that the stock issued to Von Ruck in payment for the real estate could not be sold upon the market at a fair price. These opinions were based upon the incongruous character of the corporation's holdings after the transfer took place, for the corporation then owned a cotton mill at Spray and other property of a totally different and unrelated character, consisting of the sanitarium, residence, and real estate at Asheville, 240 miles away. It was the opinion of the witnesses that the owner of the stock could secure a purchaser therefor only by accepting a purchase price having no reasonable relation to the real or intrinsic value of the corporation's assets.

We think that the testimony was quite pertinent to the issue, and that the opinion of the witnesses was in accord with the inference which a person of ordinary judgment would draw from the circumstances of the transaction. Hence it is impossible to say that the stock received had such a fair market value as would show that the owner derived a taxable gain from the transfer. It was decided in O'Meara v. Commissioner (C. C. A.) 34 F.(2d) 390, where owners of certain gas and oil leases organized a corporation and transferred the leases to it for stock, that the stock was so different from the prior holdings

of the lessees that the change was one of substance rather than of form; yet the court held that there was no taxable profit since the evidence showed that the stock could not be sold for an amount reasonably approximate to its intrinsic value. See, also, Dohman v. Commissioner, 21 B. T. A. ——. In our opinion, the decision of the Board that the taxpayer derived a profit from the transfer of his real estate was wrong and should be reversed.

▉ The second question involved in case No. 2955 is whether Von Ruck should have included in his income tax return for 1919 certain salary to which he was entitled for services to the sanitarium; and a similar question arises in the second case, No. 2956, in regard to salary for the year 1920. On July 1, 1918, soon after the death of his son, Von Ruck organized a charitable nonstock corporation, to be managed by a board of trustees, under the name of Von Ruck Memorial Sanitarium, Inc., by which the business formerly done by the Winyah Sanitarium was thereafter carried on. The trustees appointed were members of Von Ruck's family and employees of the business. One McMichael was employed as a medical examiner, but his connection with the institution was severed on or about March 1, 1919. On February 7, 1919, the executive committee of the corporation passed a resolution that Von Ruck be allowed and paid for his services to the corporation as physician and consultant either the same salary and commissions as had theretofore been paid to McMichael, or, if Von Ruck should prefer, the sum of $12,000 per year to take effect July 1, 1918, and to cover the period of one year from that date.

The business of the Winyah Sanitarium had been the personal property of Von Ruck, and the books included his personal account of cash receipts and disbursements, wherein he was credited with income from his investments, as it was collected, and charged with the expenditures made for his account. This practice was continued after the new corporation was formed; and in addition a new special account was opened in his name, marked "In Suspense," after the passage of the resolution of the executive committee. This account shows a credit to Von Ruck of $1,000 per month beginning April 30, 1919, and ending June 30, 1921, or an amount of $9,000 for the year 1919, $12,000 for the year 1920, and $6,000 for the year 1921. The question is whether the salary credited for the years 1919 and 1920 constituted income of the taxpayer which should have been included in his returns.

Von Ruck chose the alternative of a fixed salary of $1,000 per month. He, however, told the bookkeeper to hold the salary as he did not want it at that time. No entry of salary was made prior to April, 1919, doubtless because McMichael had been in general charge of the medical work prior to that month. As a matter of fact, Von Ruck never drew any of the salary. It was offered to him once or twice by the bookkeeper, but the latter was again instructed to hold it. However, there were always available funds on hand, and there is no doubt that Von Ruck could have drawn against the account at any time. On or about June 30, 1921, a new corporation, in place of the Von Ruck Memorial Sanitarium, Incorporated, was formed, to be known as the Von Ruck Research Laboratory, Incorporated. On this date Von Ruck instructed the bookkeeper that the accumulated salary should be considered the property of the new corporation, since he did not want it, and the sum of $27,000 was therefore charged off to profit and loss. There is other evidence in the record to the effect that Von Ruck had declared that he was taking no salary from the corporation.

Under these circumstances, the appellant contends that the sum of money involved was never paid to Von Ruck and never became a part of his income, and that therefore he should not be taxed upon it; and that in any event, only the salary for April, May, and June, 1919, amounting in all to $3,000, may be considered, because the resolution of the board of trustees merely covered the year ending July 1, 1919. It is said that even this amount was not income, because Von Ruck had the right either to accept or to refuse compensation, and to postpone his decision as long as he saw fit; that the entry of the credits in the suspense account, rather than in the personal account, indicated that prior to June 30, 1921, the decision was still in abeyance, and finally on that day the salary was definitely refused. The Board found that the salary had been voted for a period of a year by the trustees, and that for a period of twenty-seven months credits were made in the decedent's account on the books of the corporation; and that there was nothing in the record to show that prior to the time when he finally returned the salary, he ever had any intention of relinquishing it. Hence the Board concluded that of the $27,000 credited, $21,000 should have been included in his taxable income; that is to say, $9,000 for 1919 and $12,000 for 1920. The remaining $6,000 credited during 1921, having been returned to

the corporation within the year, was held not to be taxable income to the decedent.

We think that there is ample evidence to justify the Board's decision. Since the salary of $1,000 per month was formally authorized for the year ending July 1, 1919, and was subsequently entered each month on the books of the corporation at the direction of its active head, it is a fair inference that the salary for the period subsequent to July 1, 1919, had the approval of the corporate officials. Funds from which payment could be made at any time were available, and the taxpayer had the unqualified right at any time to reduce the credits to cash. The entry of the salary in the suspense account instead of in the personal account, customarily used to record the taxpayer's receipts and disbursements, and the final decision of the taxpayer to give back the money to the corporation, are significant circumstances; but they are not controlling, and it remained for the Board to decide what weight should be given them. Section 213(a) of the Revenue Act of 1918 (40 Stat. 1065) and the same section of the Revenue Act of 1921 (42 Stat. 237) declare that the gross income shall include gains, profits, and income derived from salaries of whatever kind and in whatever form paid. We think it may fairly be said that the available credits upon the books of the corporation, completely under the control of the taxpayer, constituted payment within the meaning of the statutes. This court held in Brooks v. Commissioner, 35 F.(2d) 178, that dividends credited to a stockholder on the books of a corporation possessed of available funds for payment should be included in his income, although not actually paid during the tax year. See, also, the decision in Appeal of John A. Brander, 3 B. T. A. 231.

No. 2956.

In the second case, No. 2956, there are two main questions, one of which has already been disposed of in the foregoing opinion, namely, the question of the salary which Von Ruck received during the years 1919, 1920, and 1921 from the Von Ruck Memorial Sanitarium, Inc. The second and more important question is whether dividends from the Spray Cotton Mills for 1920 and 1921, that is, a dividend of 10 per cent., or $100,000, paid January 10, 1920, and a dividend of 5 per cent., or $50,000, paid February 15, 1921, should have been reported in their entirety by Von Ruck as a part of his income for the respective years, or whether, on the other hand, he had made bona fide gifts of portions of the stock to certain relatives of himself and of his wife, so that the dividends thereon did not constitute a part of his income for the years in question. Deductions of $69,930 for 1920 and $37,890 for 1921 were claimed in the petition for review.

The executors of the taxpayer's estate claim that the following gifts were made:

(1) A gift by deed of trust of July 28, 1919, of 3,460 shares to William Schoenheit, trustee, for the benefit of certain German relatives of the taxpayer.

(2) A gift by deed of trust of August 1, 1919, of 1,533 shares to William Schoenheit, trustee, for the benefit of certain relatives of the taxpayer's wife, including 500 shares for Ada M. Welles and 366 shares for Mary Bishopric, sisters of the taxpayer's wife.

(3) A gift on or about August 1, 1919, of 1,000 shares to Abbie Moore, a sister of the taxpayer's wife.

(4) A gift on or about August 1, 1919, of 1,000 shares to Grace M. Schoenheit, a sister of the taxpayer's wife.

(5) A gift on or about August 1, 1919, of 756 shares to Mary Bishopric, making a total of 1,000 shares given to this donee, the original amount of 366 shares given by the above-mentioned deed of trust of August 1, 1919, to Mary Bishopric having been reduced one-third, in accordance, as it is claimed, with the provisions of that deed governing a contingency arising thereunder.

(6) A gift on or about November 6, 1920, of 28 shares to William Schoenheit.

The findings of the Board of Tax Appeals set out the payment of the dividends in 1920 and 1921, as above described, and the contention of the taxpayer that certain portions thereof should not be included in his taxable income. The deeds of trust are then described in the following language:

"On July 28, 1919, while the decedent was the sole stockholder of the Spray Cotton Mills, he entered into a trust agreement with William Schoenheit, who was his brother-in-law and business agent, whereby he was to convey in trust to said Schoenheit 3460 shares of the stock in the Spray Cotton Mills. This stock was to be held in trust for certain designated relatives of the decedent, residing in Germany and Switzerland. The agreement specifically provided that the stock should not be transferred of record to the trustee until the accumulated surplus of the corporation had been divided between the stockholders of record by extra dividends paid out of said surplus, or by issue of new

stock against said surplus. The intention of the decedent was that the stock which was being given should not participate in the surplus of the Spray Cotton Mills, but should represent only the book value of $100 per share. The agreement provided that the trustee should collect and receive the ordinary annual cash dividends on the 3460 shares of stock.

"On August 1, 1919, the decedent assigned certificates representing 1695 shares of the capital stock, all of which belonged to him, and stood in his own name or in the names of his nominees, to his wife, Delia M. Von Ruck, and on the same day, she entered into a trust agreement with William Schoenheit whereby she was to convey 1553 shares of the said stock in trust to Schoenheit. The agreement made by Delia M. Von Ruck and Schoenheit was practically identical with the trust agreement made by the decedent and Schoenheit on July 28, 1919, except that the Delia M. Van Ruck agreement provided that the stock was to be held in trust for certain designated relatives of hers."

It will be noted that in the above paraphrase of the trust deed of July 28, 1919, it is stated in effect that the taxpayer made an agreement whereby "he was to convey in trust to said Schoenheit 3460 shares of the stock," and that this stock was to be held in trust for certain of the taxpayer's relatives. The petitioners' counsel contend that the Board did not give proper effect to the terms of the instrument, and regarded it as an agreement to convey rather than a deed whereby title was actually vested in the trustee. The document recites the assignment and delivery of the certificates for the stock by the taxpayer to the trustee and the donation of the shares to the German relatives. It then provides that the trustee should hold the stock "in trust and as the property and for the benefit of the relatives" apportioned among them in various amounts. There can be no doubt that the terms of the instrument evidenced an intent on the part of the grantor to convey a present interest in the shares to the trustee. The duty of the trustee in regard to the disposition of cash and stock dividends should be emphasized, since it is an important feature in the case, as will later appear. The deed provided that the trustee should receive all cash and stock dividends declared and paid on the stock, paying over the former to the owners of the stock within thirty days after their receipt, and holding and administering any dividend stock in the same way as the original stock. It was further provided that if the surplus should not be distributed in two years after the date of the deed, the number of shares should be reduced one-third. In case of the death of the trustee, he was to be succeeded in the trust by his son, Edward M. Schoenheit, or by Karl Bishopric, the secretary and treasurer of the corporation.

The deed was delivered to Schoenheit, and a duplicate was sent to Karl Bishopric by Von Ruck in a letter of August 10, 1919, which covered also the deed of August 1, 1919. Bishopric was instructed either to retain the copies, or if he should return them, to make a memorandum of the conditions of the trust, especially as concerned the payment of dividends. Von Ruck said: "Since the latter go to the individuals to whom the stock belongs, we do not want to pay income tax on them." He also indicated that since the transfers of stock were not to be made at the time, either he or Schoenheit would have to vote the stock and receive the dividends.

The deed of trust of August 1, 1919, was executed by Delia M. Von Ruck, wife of the taxpayer, whose act it really was; certain stock having been conveyed to her for the purpose. It was substantially similar to that of her husband, except that it contained a provision that unless the corporation should distribute its surplus between its stockholders within the two years, or in case the relatives named in the deed should desire their stock to be transferred to them at any time prior to the distribution of the surplus, the number of shares held in trust should be reduced one-third and a like reduction of one-third should be made from the number of shares given by the grantor to her several relatives. Coupled with this direction was the provision that the shares of stock of two of the beneficiaries (excluding therefrom Ada M. Welles and Mary Bishopric, sisters of the grantor) should continue and remain in the hands of the trustee for a period of ten years. These terms of the agreement are mentioned at this time because they indicate that the sisters of the grantor were entitled at law to terminate the trust as to the shares given to them, and this step was actually taken, as will hereafter appear.

The Board found that the trustee executed receipts to the grantors in the deeds of trust, acknowledging the delivery by them of certain certificates of stock standing in the names of the grantors in an aggregate amount sufficient to cover the gifts. It also appears that indorsements were made on most of these certificates by Von Ruck, in-

dicating that the shares were transferred to the trustee for the benefit of the donee. But although these indorsements bear the dates of the deeds, it does not appear from any other evidence when they were actually written, nor is it clear, notwithstanding the receipts, that the indorsed certificates were actually delivered to the trustee. He had no recollection on the subject.

The Board also stated in its findings that 441 shares of stock were transferred by the taxpayer on the books of the corporation on December 6, 1920. This finding is clearly incorrect. Undisputed records of the corporation have been produced and show that shares of stock were transferred on the books of the company on November 6, 1920, as set out below:

| | |
|---|---|
| Abbie B. Moore | 667 Shares |
| Ada M. Welles | 334 Shares |
| Edward Schoenheit | 557 Shares |
| Mary M. Bishopric | 244 Shares |
| William Schoenheit | 28 Shares |
| William Schoenheit, trustee for Burdette Moore | 334 Shares |
| William Schoenheit, trustee for Lottie Walters | 167 Shares |
| Total | 2331 Shares |

It is conceded that with minor exceptions hereinafter noted, all other shares given away by the taxpayer were transferred on the company's books on April 3, 1921.

A most important circumstance in determining the nature of the transactions which took place between Von Ruck and the trustee on or about August 1, 1919, is the manner in which the dividends on the donated stock for the years 1920 and 1921 were handled by the trustee. On this subject the Board made the following finding:

"The payment by the corporation of the ten per cent dividend of January 16, 1920, was accomplished as follows: The decedent gave to Bishopric, secretary of the corporation, a list of parties to whom the dividend was to be paid, together with receipts, dated January 10, 1920, signed by William Schoenheit, trustee, and instructed Bishopric to credit him personally with the entire dividend. Carrying out these instructions, Bishopric opened an account for the various parties, credited them with the dividend, then charged them with the dividend and credited the decedent's account. The Spray Cotton Mills had $50,000 in Federal Land Bank bonds, which were at the decedent's direction transferred to him in part payment of the

dividend, the balance of (the) $50,000 remaining on the books to his credit."

The 5 per cent. dividend of February 15, 1921, was paid to the stockholders of record at that time. Checks for that dividend dated February 15, 1921, were drawn by the corporation to persons and in amounts as follows:

| | |
|---|---|
| William Schoenheit | $ 835 |
| William Schoenheit, Trustee, Burdette Moore | 1670 |
| William Schoenheit, Trustee, Lottie Walters | 835 |
| Karl Bishopric | 2950 |
| Edward Wm. Schoenheit | 3335 |
| Abbie Moore | 3335 |
| Mary Bishopric | 1220 |
| Ada M. Welles | 1670 |
| | $15850 |

The Board also found that the trustee had received the dividends for the years 1920 and 1921 on the stock covered by the deeds of trust, in the form of Federal Land Bank bonds, with the exception of the case of one beneficiary, as will hereafter appear. In addition, the trustee Schoenheit received bonds for the 1920 and 1921 dividends on the stock held by two of the sisters of Mrs. Von Ruck as follows:

| | 1920 | 1921 |
|---|---|---|
| Abbie Moore | $10,000 | $5,000. |
| Grace M. Schoenheit | 10,000 | 5,000. |

The Board listed these amounts and then made the following finding:

"$3750 representing the 1921 dividend for the benefit of Erwin Von Ruck, was sent to him direct by the decedent, who told Schoenheit not to take any cognizance of it. The other amounts listed for both years were received by Schoenheit early in 1921, in the form of Federal Land Bank bonds delivered to him by the decedent, with the exception of $1670 paid to Mrs. Welles in February, 1921, and about $1290 paid to Mrs. Schoenheit in February or March, 1921; no remittance of the items held by him to the parties listed was made by Schoenheit prior to May and November, 1925. The Federal Land Bank bonds were exchanged by Schoenheit after consultation with the decedent either for Philippine bonds or for stock of the Spray Cotton Mills, heretofore owned by the decedent."

The concluding paragraphs of the findings of fact are as follows:

"The record indicated that the decedent had the amounts in Schoenheit's hands 'held

on account of inheritance tax.' Dividends for 1922 and later years were remitted by Schoenheit to the various parties within a few days of their receipt by him.

"Bishopric, the secretary of the Spray Cotton Mills, testified that prior to October 6, 1920, to his knowledge there were no stockholders in the corporation other than the decedent, whom he understood to be the sole stockholder at that time. That, as a usual thing, the decedent ran the corporation to suit himself, and that Bishopric as secretary handled the 1920 dividends under the instructions of the decedent without knowing any reasons and that he was not aware of the trust agreements at that time.

"While the stock was transferred of record, as stated above, there is no evidence to show that it was delivered to the transferees nor that there was any intention on the part of the decedent to relinquish dominion at the time of the transfer. Dividends declared during the years 1920 and 1921, at his express direction, were paid to him and he made the distribution."

The opinion of the Board summarizes the facts above set out and reaches the following conclusion:

"For the determination of the question of the validity of a gift inter vivos certain definite and well recognized rules have been formulated. Assuming parties legally competent to act, there must be (1) a definite intention on the part of the donor to make an absolute gift; (2) delivery of the subject matter of the gift; and (3) acceptance by the donee.

"In the instant case, delivery is lacking and in addition the donor during the period under consideration continued to exercise dominion.

"As to the 441 shares of stock transferred of record on December 6, 1920, but not delivered until late in 1921, since these transfers were obviously gifts the same rule should govern as stated above. Accordingly, we are of the opinion that as to this issue, the respondent's determination should be sustained."

It will have been observed that the findings of the Board are more precise in regard to the gifts in trust than those which were made absolutely to relatives of the taxpayer. This condition undoubtedly was caused by the fact that the record shows definitely the time when the instruments purporting to convey title to the stock given in trust were executed and delivered, while the testimony as to the time of delivery of instruments of title to the shares of stock given absolutely is for the most part vague and confusing. As to the stock given in trust, the taxpayer contends that the trust agreements vested title in the trustee on the respective dates of their execution and delivery, and that therein are found the essentials of a valid gift, namely, an intention to give, and a delivery and acceptance of the subject of the donation. It is insisted that Von Ruck, under the trust agreements, did everything possible for him to do to transfer the dividends to the trustee. They had not been declared at the time of the execution of the agreements, and consequently could not be finally delivered; but they could be assigned by deed, and were so assigned by the express direction to the trustee to collect the ordinary annual cash dividends and remit them to the beneficiaries, the instruments declaring that the dividends should be their property. It is contended that the title thereby vested in the trustee was irrevocable, and that the subsequent actions of the donor and the trustees in collecting the dividends and withholding them from the beneficiaries was a breach of their obligations under the trusts which in no way affected the validity of the transfers. Consequently it is said that although the donor may have received and retained the dividends during the period in question, they were the property of his donees and should not be included in his income.

The appellants interpret the opinion of the Board as holding that the deeds of trust were merely executory agreements to convey title to the shares of stock in the future, and were not sufficient in law to vest a present interest in the grantee. It is by no means clear that such was the legal conclusion of the Board; but the point is not material. It is not essential to a transfer by gift of legal title to stock under the law of North Carolina that there be a transfer on the books of the company, Grissom v. Sternberger (C. C. A.) 10 F.(2d) 764; and we have no doubt that the taxpayer could have effectuated a valid gift on or about August 1, 1919, of the stock in question by the deeds of trust, even though there was no transfer on the books until a later date; provided, of course, that it was the intention of the parties that the deeds should go into actual effect on the date of their execution. On the contrary, if it was the understanding and intent of the parties that the taxpayer should retain control, and exercise dominion over the stock and the dividends thereon until some future date when the deeds should be given full force and

effect, the transfer would constitute only a colorable transaction to which the law would not give effect and the income from the property in the meantime would belong to the donor rather than to the donees.

This was in effect the finding of fact of the Board which said in substance that the taxpayer had failed to deliver the stock certificates to the donees until after the dividends were declared; and also that, in the meantime, he exercised dominion over the stock and the dividends thereon. It expressly declared in regard to the stock transfers of November 6, 1920, that while the stock was transferred of record, there was no evidence to show that it was delivered to the transferees or that there was any intention on the part of the taxpayer to relinquish dominion at the time; and it is obvious that the Board also held the opinion that whatever may be the ordinary effect of the execution of such instruments as the deeds of trust, the donor in this case did not intend to relinquish dominion over the shares described until he would give the word at some future date.

Such being the finding of the Board, the only problem of this court is to ascertain whether there is substantial evidence in the record to support it. There can be no doubt that the taxpayer in the year 1919 had formed the intention to make substantial gifts of his property to his relatives and to those of his wife. There is abundant testimony to show his liberality towards his relatives and connections in this country and Germany, and his desire to take care of them in the future. His only descendants had died in the previous year. He was approaching 70 years of age and his wife was an invalid of advanced years. Very shortly before the execution of the deeds of trust, he had brought together substantially all of his property, as we have seen in the discussion in case No. 2955, under the control of the Spray Cotton Mills. It seems therefore to be perfectly clear that the various transactions in the year 1919 were in conformity with a general plan to make distribution of large portions of his estate which was to be put into effect at that time or at some time in the future. The precise question in the pending case is when the gifts under discussion were to go into effect.

In determining this issue, it is necessary to bear in mind the dominating position which the taxpayer occupied. He was unquestionably the head of the family and occupied a position of authority over all of the persons who participated actively in the stock trans-

fers. The German relatives, whose names were mentioned in the first deed of trust, were distant from the scene of action and were dependent upon his generosity. They were represented in the transaction by persons who were in effect employees of the taxpayer. The trustee in the deed of trust, William Schoenheit, was the taxpayer's brother-in-law and for many years had been the general manager of the business of the tubercular sanitarium owned by the decedent. His wife was the beneficiary of an absolute gift of stock, and he himself was also a donee of stock. His son was a medical student, or a physician, who was occupied in and about the sanitarium.

The secretary and treasurer of the corporation was Karl Bishopric, a nephew of the taxpayer's wife. He seems to have been the personal representative of the taxpayer in managing the affairs of the corporation. His mother was a beneficiary of the taxpayer to the extent of 1,000 shares of stock. He was named as an alternative trustee in the deeds. The duplicate deeds of trust were sent to him on August 10, 1919, but made so little impression upon him that he forgot them entirely, recognized the taxpayer as the sole owner of the corporation's stock until the transfers of November 6, 1920, and took directions from him as to the transfer of stock on the books and the distribution of dividends. It is not an unreasonable inference from these facts that the trustee in the deeds would be willing, if requested by the donor, to hold the deeds and the dividends subject to his further orders until he should be ready to put the gifts into effect.

The appellants point out that there was good reason for delaying the transfer of the stock upon the books of the company, in that the deeds of trust expressly provided that the stock should not be transferred until the accumulated surplus had been distributed. This step was not taken until after the declaration of the 1921 dividend, when a stock dividend of $500,000 was declared and delivered in its entirety to Von Ruck, as the person who was the sole stockholder of the company before the donations in question took place. This circumstance, however, does not account for the withholding by the parties to the deed of the cash dividends for the years 1920 and 1921. As we have seen, the 1920 dividend in its entirety and the greater part of the 1921 dividend was paid to Von Ruck. Notwithstanding the provisions of the deeds of trust, he retained the amounts paid to him until after the declaration of the 5 per cent. divi-

dend in 1921, when he delivered both dividends payable to the trustee under the deeds in the form of Federal Land Bank bonds. Furthermore, the trustee did not pay or deliver the dividends to the beneficiaries until 1925, although it would appear that beginning with the year 1921, he paid to the beneficiaries the interest on the bonds. In the meantime, either in 1921 or 1922, with the advice and consent of Von Ruck, he sold the Federal Land Bank bonds and reinvested the proceeds in Philippine bonds. These were finally sold in 1925 and the proceeds paid to the beneficiaries entitled. The record contains no adequate explanation for this conduct. The opinion of the Board refers to evidence to the effect that the dividends were retained by the trustee at Von Ruck's direction on account of inheritance taxes; but the record does not explain what inheritance taxes were referred to, and there is an entire absence of any evidence that the dividends were withheld and invested with the consent or authority of the donees mentioned in the deed. It is quite clear that both parties to the deed ignored the explicit directions therein, and that the trustee in the deed and the executive officers of the corporation recognized the authority of the donor to handle the stock and the dividends thereon for his own account. Under these circumstances we are of the opinion that there was abundant justification for the conclusion of the Board that the gifts to the taxpayer's relatives were not intended by him to take effect as of the date of the deeds of trust, but at such later date as he might determine, reserving to himself, in the meantime, dominion and control over the property. Therefore in so far as the Board has determined that the dividends for 1920 and 1921 on the stock covered by the deed of trust should be included in the income of the taxpayer, the conclusion of the Board should be affirmed.

But we think that the conclusion of the Board as to the dividends on certain stock transferred by Von Ruck to certain donees absolutely and free from trusts should be modified. Von Ruck made gifts of stock as follows: 1,000 shares each to Abbie Moore, Grace M. Schoenheit, and Mary Bishopric, 500 shares to Ada M. Welles, all of whom were sisters of Mrs. Von Ruck, and 28 shares to William Schoenheit; and that these gifts, except as to certain of the shares given to Ada M. Welles and Mary Bishopric, were in addition to those covered by the deeds of trust. The contention is that all of these donations except that to William Schoenheit

took place on or about August 1, 1919, and that therefore the dividends thereon for 1920 and 1921 were the property of the donees. The Board of Tax Appeals rejected this contention in its entirety, and as to a number of the shares, there is substantial testimony to support the conclusion; but we think it was erroneous as to those shares of stock which were transferred on the books of the company on November 6, 1920. The record in the case is so vague and confusing on the points under discussion that counsel for appellants was given an opportunity to file an explanatory supplemental statement, and the case was argued a second time; so that the conclusions which we announce were arrived at only after a particularly painstaking study of the facts.

The intention of Von Ruck to make the gifts in question was doubtless expressed on or before August 1, 1919; but the burden of proof was of course upon the representatives of the taxpayer's estate to show not only this intention, but the precise time when the gifts were effectuated by delivery of the shares to the donees. It was conceded in the petition for review that prior to the execution of the first deed of trust on July 29, 1919, Von Ruck was the only shareholder of the corporation, notwithstanding the fact that for divers reasons, certain shares stood on the books of the company in the names of other persons. In addition, Karl Bishopric, the secretary and treasurer of the corporation, testified that prior to the transfers of November 6, 1920, Von Ruck was the sole stockholder of the corporation, and it thus appears that there was substantial basis for the finding of the Board that none of the gifts took place prior to the declaration of the dividend in the year 1920. But it is clear that the Board was not justified in ignoring the undisputed testimony as to the transfers on the book on November 6, 1920, and the payment of the 1921 dividend, when declared, to the stockholders of record. The Board fell into error, doubtless caused by the confusing state of the record, in finding that only 441 shares of stock were transferred from the name of the taxpayer on the books of the corporation on that date, whereas the records of the corporation plainly show that 2,331 shares were then transferred to the donees whose names have been set out above. The names of the donees and the amount of stock transferred to each on November 6, 1920, and April 3, 1921, respectively, making up in the aggregate the gifts in question, are shown by the following table:

| Donee | Stock Trans-<br>ferred Novem-<br>ber 6, 1920. | Stock Trans-<br>ferred April<br>3, 1921. | Total |
|---|---|---|---|
| Abbie B. Moore | 667 Shares | 333 Shares | 1000 |
| Ada M. Welles | 334 Shares | 166 Shares | 500 |
| Edward Schoenheit, representing Grace M. Schoenheit | 557 Shares | 333 Shares | 890 |
| Mary M. Bishropic | 244 Shares | 756 Shares | 1000 |
| William Schoenheit, trustee for Burdette Moore | 334 Shares | 166 Shares | 500 |
| William Schoenheit, Trustee for Lottie Walters | 167 Shares | | 167 |
| William Schoenheit | 28 Shares | | 28 |

The gift of 1,000 shares to Grace M. Schoenheit was made up by adding to the total of 890 shares shown above, 110 shares which before November 6, 1920, stood in the name of Edward Schoenheit for purposes of convenience and which the government admits should be excluded in computing the dividends chargeable to Von Ruck.

It is a fact, as the Board pointed out in its finding and opinion, that the shares of stock transferred on November 6, 1920, were not delivered until late in 1921. But we do not think that it follows, as the Board concluded, that there was no evidence of an intention on the part of the grantor to relinquish dominion of the stock at that time. Even if the certificates were not delivered to the new shareholders, the transfers on the books were sufficient to vest the title in the new owners if made by Von Ruck with that intention. That such was his intention is shown by the issuance to the new shareholders on February 15, 1921, of dividend checks for the dividend of that year. The total sum distributed in this way to persons other than Von Ruck was $15,850. The names of the persons to whom the new shares were transferred on November 6, 1920, and the distribution of the sum named on February 15, 1921, have already been set out. Certain discrepancies appear between the amount of stock held by the several shareholders and the amounts of the dividends paid. The total dividends on 2,331 shares of stock transferred would amount to $11,655, whereas $15,850 was actually paid. The excess is made up as follows:

The evidence satisfactorily accounts for the excess payment to Edward Schoenheit, since it represents the dividend on 110 shares already mentioned. But there is no explanation for the payment of $835 to William Schoenheit, when only $140 was due.

The dividend to Karl Bishopric, amounting to $2,950, represents the dividend due on 590 shares, and his evidence shows that prior to November 6, 1920, this number of shares stood in his name, not as an actual shareholder, but as a holder for the account of the taxpayer. However, it does appear from the uncontradicted testimony that on or about November 6, 1920, Bishopric purchased 167 shares of stock from Von Ruck and it was arranged between them that he was to be considered the owner of that number of shares standing in his name and was to receive dividends thereon.

From these calculations, it would appear that dividends due and owing, according to the records of the corporation, to the stockholders in question amounted to the aggregate sum of $13,040, made up as follows:

To shareholders of stock transferred November 6, 1920 ............... $11655

Edward Schoenheit, dividend on 110 shares ........................ 550

Karl Bishropic, dividend on 167 shares ........................ 835

$13040

| Name of Shareholder | Number of Shares issued | Amount of Dividend Payable | Amount actually paid | Excess |
|---|---|---|---|---|
| William Schoenheit | 28 | $ 140 | $ 835 | $ 695 |
| Edward Schoenheit | 557 | 2785 | 3335 | 550 |
| Karl Bishropic, to whom no stock was issued on November 6, 1920 | | | 2950 | 2950 |
| | 585 | $2925 | $7120 | $4195 |

We think that the undisputed facts in the record as to the transfer of the stock on the books of the company on November 6, 1920, and the dividends paid thereon in the sum of $13,040, require the holding that the donor not only intended to give but actually carried his intention into effect in regard to the shares described, and that the dividends for 1921 thereon should not be included in the taxpayer's income for 1921. But the evidence does not show that the other gifts were consummated until after both dividends had been declared and paid. In short, it is our conclusion in the second case that the findings of the Board of Tax Appeals should be affirmed in toto in regard to the 1920 dividend of 10 per cent., but should be modified as to the 1921 dividend of 5 per cent. to the extent that from the sum of $50,000, charged as a part of the taxpayer's income for the dividend of 1921, there should be deducted the sum of $13,040.

## No. 2973.

This case requires a determination of the amount of federal estate tax due by the executors of the estate of Von Ruck who died on November 5, 1922. The Commissioner claims a deficiency of $139,091.56 with interest from November 5, 1923. The following questions are involved:

(a) Whether the gifts of stock of the Spray Cotton Mills, aggregating 7,628 shares, discussed in the foregoing opinion, were made in contemplation of death and should therefore be included in ascertaining the value of the gross estate in accordance with the provisions of section 402 (c) of the Revenue Act of November 23, 1921, 42 Stat. 278.

(b) Whether said section of the Revenue Act of 1921 may be applied to transfers in contemplation of death made before the passage of the act.

(c) The value of the Spray Cotton Mills' stock on November 5, 1922.

(d) Whether the residuary estate, having been bequeathed subject to certain conditions to the Von Ruck Research Laboratory, Incorporated, should be included in the gross estate under the provisions of section 403 (a) (3) of the Revenue Act of 1921, 42 Stat. 279.

(a) As we have seen in the prior case, none of the gifts was perfected or took effect until November 6, 1920, a date within two years prior to the decedent's death; and hence under the terms of section 402 (c) these voluntary transfers must, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of the statute. The Board of Tax Appeals

held that this burden had not been met; and we think there was ample evidence to sustain the finding. Indeed, we should reach the same conclusion even though it should appear that the gifts were made on or about August 1, 1919, more than three years prior to Von Ruck's death, as the representatives of his estate contend. At that time the deceased was about 70 years of age; his only child and his only grandchild had died; and he had brought together substantially all of his property into the hands of a single corporation, whose shares he had taken steps to distribute amongst relatives of himself and wife in such substantial amounts that when the gifts were effected, he had parted with the larger part of his estate. Here was substantial evidence that the dispositions in question were testamentary in character. Furthermore, sickness of a serious character overtook him in the latter part of 1920. To overcome this evidence, testimony was offered by the executors tending to show that at the beginning of this illness, Von Ruck did not realize its gravity; that he kept up his activities as a business and professional man almost to the end; and that he was making plans for the future. But the effect of this countervailing evidence was merely to raise an issue of fact which, under the law, the Board alone is authorized to decide. Our function is performed when we point out that the Board's conclusions had substantial support in the testimony offered, and should therefore be affirmed.

(b) The executors contend that even if the gifts in question were made in contemplation of death, they should not enter into the sum total of the estate, subject to the tax under section 402 (c) of the Revenue Act of 1921. That section expressly covered transfers made in contemplation of death (whether made before or after the passage of the act), except in case of a bona fide sale for a fair consideration; but it is argued that in so far as the act applies to transfers made before its passage, it constitutes arbitrary, capricious, and confiscatory legislation in conflict with the Fifth Amendment to the Constitution of the United States; and this contention is supported by reference to the decision of the Supreme Court in Nichols v. Coolidge, 274 U. S. 531, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081. In that case the court held that the act is unconstitutional in so far as it requires that there be included in the gross estate the value of property transferred by decedent prior to the passage of the act and intended to take effect in possession or enjoyment at or after death; because, other-

wise, the amount of the tax would depend upon last lawful transactions beyond recall and not testamentary in character. The same idea was further elucidated in the subsequent case of Blodgett v. Holden, 275 U. S. 142, 147, 48 S. Ct. 105, 72 L. Ed. 206, where the Revenue Act of 1924 (43 Stat. 253), undertaking to impose a tax on gifts fully consummated before that subject was considered by Congress, was held arbitrary and invalid since it seemed to the court wholly unreasonable that one who, in entire good faith and without the slightest premonition of such consequence, made absolute disposition of his property by gifts, should thereafter be required to pay a charge for so doing.

It will have been noticed that of the two events which must happen before the liability of an estate arises under the provisions of the law under examination, namely, the transfer of assets without fair consideration, and the death of the transferor, the first happened in this case in 1920 or 1921, prior to the effective date of the Revenue Act of 1921, while the second took place subsequently, in the year 1922. Hence the facts superficially considered may seem to fall within the cases cited; but actually, radical differences exist. First, it may be noted that the gifts of Von Ruck were really testamentary in character, and it is settled by Nichols v. Coolidge, supra, see page 542 of 274 U. S., 47 S. Ct. 710, that Congress may require that property subsequently transferred in contemplation of death be treated as part of the estate for purposes of taxation because this is necessary to give practical effect to the power and to prevent evasion. Second, the transfers in the cited cases took place before there was any congressional legislation on the subject; but the transfers in the case at bar, although made prior to the Revenue Act of 1921 under which it is sought to impose the tax, were made with full notice on the part of the decedent that the property transferred was likely to be included in his estate at the time of his death for the purposes of taxation under the provisions of the Revenue Act of 1918, 40 Stat. 1057, 1096, in force at the time. Section 402 (c) of that act (40 Stat. 1097) was identical in terms with section 402 (c) of the Revenue Act of 1921 (42 Stat. 278), and the amount of the tax, calculated in percentages of the net estate, was the same in section 401 of the earlier act (40 Stat. 1096) as it was in the corresponding section of the later act (42 Stat. 277). Hence it follows that the element of surprise and unfairness which gave the earlier legislation its obnoxious and arbitrary character, when applied to the facts of the cited cases, is entirely lacking in the application of the estate tax provisions of the Revenue Act of 1921 to the circumstances of the case at bar.

The executors of the estate nevertheless contend that we may not take into consideration section 402 (c) of the Revenue Act of 1918, which was in force at the time of the transfers, because prior to the death of Von Ruck in 1922, it had been repealed. Section 401 of the Revenue Act of 1921 (42 Stat. 277) expressly provides that "in lieu of the tax imposed by Title IV of the Revenue Act of 1918, a tax equal to the sum of the following percentages of the value of the net estate * * * is hereby imposed upon the transfer of the net estate of every decedent dying after the passage of this Act."

Section 1400(a) of the Revenue Act of 1921 (42 Stat. 320) provides that title 4 of the Revenue Act of 1918 (sections 400–410, 40 Stat. 1096–1101) shall be repealed upon the passage of the law, and section 1404 (42 Stat. 321) provides that the act should take effect upon its passage, to wit, November 23, 1921.

What became of the taxes incurred under the act of 1918 but not collected at the time of its repeal? These were taken care of by section 1400(b) of the Revenue Act of 1921 (42 Stat. 321) which provides, in part:

"(b) The parts of the Revenue Act of 1918 which are repealed by this Act shall (unless otherwise specifically provided in this Act) remain in force for the assessment and collection of all taxes which have accrued under the Revenue Act of 1918 at the time such parts cease to be in effect, and for the imposition and collection of all penalties or forfeitures which have accrued or may accrue in relation to any such taxes. In the case of any tax imposed by any part of the Revenue Act of 1918 repealed by this Act, if there is a tax imposed by this Act in lieu thereof, the provision imposing such tax shall remain in force until the corresponding tax under this Act takes effect under the provisions of this Act. * * *"

Construing the statute with literal strictness and ignoring the patent fact that a system of continuous tax laws was in the legislative mind, the executors say that every right to reach transfers made before November 23, 1921, under the Revenue Act of 1918, was lost by its repeal on that date as to all persons who survived that date, while the right to reach such transfers by such persons under

the Revenue Act of 1921 was not given be; cause, as to them, the act was subsequent and arbitrary legislation. It would follow from this position that no such transfers could enter into the value of the net estate when computing the federal estate tax, while transfers made by persons dying before November 23, 1921, and transfers made after that date would be considered in estimating the net estate of decedents for purposes of taxation. That Congress ever intended so whimsical a result no one seriously contends; but it is said that by mistake Congress left this inconsistency in the law and the executive is powerless to remedy it. We think that such is not the case. There are indeed decisions in which a similarly narrow construction has been applied under differing circumstances to section 1400(b) of the Revenue Act of 1921. See Duggan, Executor, v. Commissioner, 8 B. T. A. 482; Wilmington Trust Co. v. United States (D. C.) 28 F.(2d) 205. But the weight of authority lays down a more liberal and in our opinion a more acceptable rule. Hanna v. United States, 68 Ct. Cl. 45; Page v. Skinner (C. C. A.) 298 F. 731; Flannery v. Willcuts (C. C. A.) 25 F.(2d) 951; United States v. Ayer (C. C. A.) 12 F.(2d) 194; Ewbank v. United States (D. C.) 37 F.(2d) 383; Cohan v. Commissioner (C. C. A.) 39 F.(2d) 540.

It is perfectly clear that if Congress had provided in the act of 1921 that section 402 (c) of the act of 1918 should remain in force as to transfers made subsequent to its passage by persons dying after the effective date of the act of 1921, such a provision would have been enforcible. In lieu thereof, Congress provided in the Revenue Act of 1921 for a tax of the same amount covering the same kind of transfers in regard to the estates of persons dying subsequent to its passage. It is manifest that this statute did not reach any transaction which was not reached under the statute which it supplanted. The mere fact that the new act literally considered taxed transactions that were past and gone is not of itself sufficient to invalidate it. The right to pass such legislation so long as it is reasonable in substance and effect is well established. See the authorities collected in the dissenting opinion of Mr. Justice Brandeis in Untermyer v. Anderson, 276 U. S. 440, 447, 48 S. Ct. 353, 72 L. Ed. 645, and also Cooper v. United States, 280 U. S. 409, 50 S. Ct. 164, 74 L. Ed. 516. We perceive no injustice or arbitrary conduct offensive to the Constitution in the fact that under circumstances like those in the case at bar, the taxing provisions are found in the subsequent rather than in the earlier act. On the contrary, if these statutes should be so construed as to relieve transactions like those under consideration from taxation, and at the same time to cover those of an earlier and a later date, the legal effect would have precisely that arbitrary and capricious character which the Supreme Court has condemned.

In our opinion, the gifts of Von Ruck in 1920 and 1921 were made in contemplation of death and should be added to the net estate of the decedent and subjected to the estate tax provided by the Revenue Act of 1921.

(c) For several reasons, it was necessary for the Commissioner of Internal Revenue to ascertain the value of the stock of the Spray Cotton Mills on November 5, 1922, when Von Ruck died, in order to compute the amount of the estate tax. First, Von Ruck was the owner of certain shares of the stock at the time of his death; and, second, the shares transferred to his relatives and friends in contemplation of death were necessarily included in the gross estate, under the terms of the statute, to establish the basis of the tax. Furthermore, the record showed that in August and October, 1922, Von Ruck sold to certain relatives of his wife 1,551 shares of the stock at the price of $63.74 per share. The Commissioner found that the stock was worth $149 per share on November 5, 1922, and that the transfers were not sales for a fair consideration under the provisions of section 402(c) of the Revenue Act of 1921, but were transfers made in contemplation of death; and that therefore the difference between the actual value and the price paid should be included in the gross estate. The Board affirmed this finding, and its action is one of the points for review in this case. If the finding is supported by substantial evidence, the determination should not be disturbed for it would follow, as a matter of course, that the sales were not bona fide and for a fair consideration.

The executors of the estate strenuously contend that this valuation was very excessive and without substantial evidence to support it, and that in fact the stock was not worth more than $58.72 per share when Von Ruck sold it. The valuation of industrial enterprises of this sort is seldom an easy matter. It is unusually difficult here because Von Ruck had been the sole owner since 1915, when he bought the last outstanding lot of stock at par, and in the meantime, no sales save those in question had taken place. Moreover, the character of the assets of the company had been greatly changed in the year 1919 when

the conveyance to it of the real estate, largely unproductive, discussed in case No. 2955, took place, and the capital stock of the company was increased from $400,000 to $1,000,000. Before this issue, the number of outstanding shares had varied from 1,746 in 1912 to 4,000 in 1917 and 1919; and later in February, 1921, an additional 5,000 shares preferred stock was issued, so that when the sales took place, the total capitalization was $1,500,000. The value of the stock was of course greatly affected by the varying business conditions; particularly those which prevailed after the Great War in the period from the years 1919 to 1922, which were reflected in a substantial increase in earnings during the years 1919 and 1920 and a substantial decrease in the subsequent years.

Hence the task of the Commissioner and of the Board was difficult, and dependent to some extent upon the exercise of sound judgment or estimate rather than upon precise calculation in reaching a result; so that there is more than ordinary cause to apply in this instance the well-settled rule that the decision of the Board must be accepted as final if supported by substantial evidence. The precise method used by the Treasury Department and the Board in reaching a result does not appear in the record, but it is obvious that they gave much weight to the net earnings of the company during the ten years preceding the decedent's death, as shown by the books of the company. In its opinion the Board said:

"The seventh issue raised is the value of the common stock of the Spray Cotton Mills at November 5, 1922, the date of the decedent's death.

"The respondent determined a value of $149 per share as of this date. The petitioners are contending that its value is not in excess of $58.72 per share. Evidence was introduced by the petitioners seeking to use 8 times its average earnings as a basis.

"The situation is unusual. In 1919, the decedent conveyed real estate, not necessary for the conduct of his business, to the Spray Cotton Mills, which we have determined had a value of $675,000. For a long period of years, the decedent was the sole stockholder of the corporation and he allowed its surplus to accumulate in bonds.

"An analysis of the net earnings from 1909 to 1918, from 1912 to 1921 and from 1919 to 1921 shows the following average annual earnings per share: $14.89, $18.99 and $17.98 respectively.

"The balance sheet as at October 31, 1922,

within a very few days of the date of the decedent's death, shows bonds, certificates of deposit and notes in the total amount of $734,342.23. No evidence was introduced as to the value of the mill property. With quick assets of $73.43 per share, real estate of $60 per share and no evidence as to the value of the mill, we are of the opinion that the determination of $149 of the respondent as the value of the stock of the Spray Cotton Mills on the date of decedent's death should not be disturbed."

In contrast with this finding is the contention of the executors of the estate. Making use of the same books of account, they say that if the figures are properly interpreted, and due allowance is made for the fact that there were 10,000 shares of common and 5,000 shares of preferred stock outstanding when the purchases were made, the average annual earnings did not at any time during the period under discussion exceed the sum of $7.53 per share. Considering that both parties made use of the same books of account, the great difference in the results of the calculation is difficult to understand; and in view of the absence from the record of an explanation of how the Board reached its conclusions, we find ourselves unable to say that substantial support can be found for them. There are apparent inconsistencies in the findings which we have been unable to reconcile. Thus, in the quoted passage, reference is made to bonds, certificates of deposits, and notes amounting to $734,342.23, belonging to the company on October 31, 1922, together with real estate worth $675,000, for which in 1919 the company gave $75,000 in cash or credits and $600,000 in stock; and the opinion rests its determination of $149 per share at least in part upon the fact that the company was possessed in 1922 of quick assets of $73.43 per share and real estate of $60 per share. The assumption is that there were 10,000 shares of stock outstanding; but it is undisputed that at this time there were outstanding not only 10,000 shares of common but also 5,000 shares of preferred stock.

In addition we cannot find in the record an explanation which enables us to reconcile the finding of the Board that in 1919, after the transfer of the real estate, the stock was worth $100 per share, as we have seen in case No. 2955, with the finding that in 1922 the stock was worth $149 per share. It was, of course, possible for the stock to have increased in value in the interval; but if we refer to the earnings from 1919 to 1922, we find that although there was a very large in-

crease in the year 1920, there was, on the other hand, a very great shrinkage in 1921; and that in 1922, the earnings were less than they had been in the year 1919. It does not appear that these circumstances furnish ground for the estimate of increased value. Moreover, the explanation does not appear when the balance sheets of the company, upon which the Board relied, are analyzed. The Board held that in 1919 the stock was worth only $100 per share, notwithstanding the fact that its book value, after the new stock was issued, as shown by the company's accounts, was $157 per share. In contrast with this determination is the valuation of $149 per share as of November 5, 1922, although the balance sheet of October 31, 1922, to which the Board referred in its opinion, shows that the book value of the assets at that time was approximately $121 per share. Neither the findings nor the opinion of the Board attempts to reconcile these figures or to explain more fully the basis for its conclusions. Under these circumstances, being uncertain as to the basis of the Board's calculation, we think that in justice to the parties to the case, this phase of the controversy should be remanded for further proceedings in which the value of the stock in 1922 may be redetermined by the Board.

 (d) The Commissioner of Internal Revenue included within the gross estate of the decedent the value of the residuary legacy created by his will. This action was complained of on the ground that the value of the residuary estate should have been deducted from the gross estate in order to determine the net estate taxable under the terms of section 403(a)(3) of the Revenue Act of 1921, which provides for the deduction from the value of the gross estate of the amount of all bequests to and for the use of any corporation organized and operated exclusively for charitable purposes, or a trustee or trustees exclusively for such charitable purposes. The will of Von Ruck provided that the remainder of the estate, after providing for certain legacies and taxes, should go to and vest in the Von Ruck Research Laboratory, Inc., a corporation organized under the laws of North Carolina, the income therefrom to be used by that corporation or the trustees thereof for scientific research study and experiment in tuberculosis, or for the aid of tubercular persons who might be patients in the Von Ruck Memorial Sanitarium and who might be in need and unable to procure adequate and satisfactory treatment. The will further provided that in case a majority of the trustees of the Research Laboratory should conclude and determine that the objects and purposes for which the corporation was created had been attained as far as the same was possible, or that the further maintenance of the research and charitable work could procure no useful purpose, or if for any other reason satisfactory to the majority of the members of the board of trustees, the research laboratory should be discontinued, then the residue of the estate so bequeathed to the laboratory should be returned to the estate and distributed in certain percentages to relatives of the decedent and of the decedent's wife. The trustees of the Research Laboratory were relatives of the decedent, relatives of the decedent's wife, and persons closely affiliated with them.

The Von Ruck Research Laboratory, Inc., came into existence in the year 1921 by amendment to the certificate of incorporation of the Von Ruck Memorial Sanitarium, Inc., whose name was thereby changed. The purposes of the corporation, amongst other things, were stated to be to conduct, control, manage, and maintain hotels, sanitariums, or hospitals in Asheville, N. C., or elsewhere, for the prevention and treatment of tuberculosis and other diseases, and for the cure, treatment, and immunization of persons suffering from tuberculosis and any and all other diseases or maladies. It was provided that the corporation should have no capital stock, but should be managed by the incorporators and their successors as a board of trustees, and that the business to be carried on should not be conducted for profit to the trustees or the officers, but all of the money, income, and profits realized in the conduct of the business after the payment of necessary expenses should be held and used for the treatment, care, protection, and benefit of persons threatened with or suffering from tuberculosis or other like diseases who should not be financially able to pay the full or necessary expenses of care and treatment.

The executors contend that when the provisions of the will and of the charter are considered, it becomes clear that the residuary bequest falls within the description of section 403(a)(3) of the Revenue Act of 1921 and should therefore have been deducted as to its value from the gross estate of the decedent on the ground that the testator clearly provided that the bequest should go to a corporation charitable in its nature and should be used exclusively for charitable purposes.

The findings and opinion of the Board point out, on the other hand, that there was a close association between the Von Ruck Re-

search Laboratory, Inc., and the Von Ruck Memorial Sanitarium, Inc. The latter was a stock corporation (succeeding the earlier corporation of the same name), which operated the sanitarium of the decedent for profit; and subsequent to the death of Von Ruck, the funds bequeathed to the charitable corporation were largely used to pay the expenses incurred by needy persons in the sanitarium, and thereby indirectly supplemented the revenues of that business institution. On this account the Board held that the terms of the statute authorizing the deduction were not complied with.

The Board also relied upon the fact that under the terms of the will of Von Ruck, it was solely within the discretion of the trustees of the Research Laboratory to discontinue the business of the charitable corporation if, for any reason satisfactory to the majority of them, it should seem best to do so. We think this circumstance a sufficient ground on which to affirm the conclusion of the Board. It is obvious that it was within the power of the trustees of the charitable corporation at any time to abandon its work and thereby cause the funds of the institution to be distributed in accordance with the final clauses of the will to persons who were for the most part relatives or connections of the trustees themselves. We do not mean to suggest that they would be controlled by unworthy motives, for there is nothing in the record to indicate that the trustees would be unwilling or unable to give an honorable administration of their trust. Nevertheless they were clearly empowered under the will to divert the funds from the charitable purposes and divide them amongst private individuals, and this provision of the will in our opinion deprived the bequest of that exclusively charitable quality which the statute contemplates. Only those bequests which are given to or for the use of a corporation organized exclusively for charitable purposes may be deducted from the gross estate. It certainly cannot be said that a bequest which is so made that it is optional, whether it shall be devoted to charitable purposes or be put to other uses of a non-charitable character, is a bequest made exclusively for charitable purposes. It was held by the Supreme Court in Humes v. United States, 276 U. S. 487, 48 S. Ct. 347, 72 L. Ed. 667, that a contingent bequest, the value of which cannot be determined from known data, but depends on mere speculation, should not be deducted from the gross estate in ascertaining the estate tax. See also Kahn v. Bowers (D. C.) 5 Am. Fed. Tax Reports, 5888, affirmed (C. C. A.) 9 F.(2d) 1018. We are aware that speaking with technical accuracy, the bequests in the cases cited were of a contingent character, whereas the bequest under the Von Ruck will created a vested interest in a charitable corporation, subject only to be divested in the discretion of the trustees of the corporation; but we do not think that the solution of this question depends upon the precise legal character of the estate created by the will. The real inquiry is whether the bequest is one which in all events is to be devoted to charitable purposes, and that inquiry in the case at bar must be answered in the negative. We think that the following statement of the Supreme Court of the state of Washington in Re Duncan's Estate, 113 Wash. 165, 193 P. 694, 697, is pertinent:

"We have sought for some way to avoid a diminution of this fund, but since it is wholly within the discretion of the trustees to divert the fund as and when they see fit, and when so diverted it must be treated as the remainder of the estate, we see no escape from the conclusion that if to do good in this case we should lay down the rule that the fund is not taxable, we would thereby open a way by which the unprincipled might in all cases avoid the tax entirely."

See also In re Beekman's Estate, 232 N. Y. 365, 134 N. E. 183.

The conclusions of the Board under consideration should be modified, and the cases are remanded for further proceedings consistent with these opinions.

Modified.