## HITCHCOCK v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5550.

Circuit Court of Appeals, Sixth Circuit.

Nov. 5, 1930.

John W. Ford, of Youngstown, Ohio (Kennedy, Manchester, Ford, Bennett & Powers, of Youngstown, Ohio, on the brief), for petitioner.

John V. Groner, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and J. Louis Monarch, C. M. Charest, and Allin H. Pierce, all of Washington, D. C., on the brief), for respondent.

Before MOORMAN, HICKS, and HICKENLOOPER, Circuit Judges.

MOORMAN, Circuit Judge.

Prior to March 1, 1913, and continuously until March 11, 1916, petitioner owned 1,000 of the 4,000 shares of the capital stock of the Andrews & Hitchcock Iron Company. During all that time that company owned 12 per cent. of the capital stock of the Mahoning Ore & Steel Company, the lessee for 97 years from April 1, 1895, of certain mineral lands in the Mesaba Range of Minnesota. The remaining stock in the Mahoning Company was owned by other steel companies. By contract entered into December 16, 1914, the stockholders of the Mahoning Company agreed that in the future the output of the mines of the company should be sold exclusively to themselves; that the board of directors of the company should fix, on or before April 1st of each year, the amount of ore to be produced from the mines during the year; and that each stockholder should be entitled to take annually its share of the ore produced at a price to be fixed by the board at or about the cost of production. Later, on March 11, 1916, while this contract was in effect, all the stockholders of the Andrews & Hitchcock Iron Company, including petitioner, sold and transferred their stock in that company to the Youngstown Sheet & Tube Company. The consideration paid by the Youngstown Company was $2,200,000 in cash, plus a contract by which it agreed to take annually the full quota of ore to which the Andrews Company might be entitled under the contract of December 16, 1914, and to pay to each of the selling stockholders his proportion of sixty cents a ton for each ton of ore which it so took. The transferred stock was deposited by the Youngstown Company as security for the carrying out of this contract.

The petitioner received payments on the contract according to its terms for each of the years 1918, 1919, and 1920. In determining his tax liability for those years the commissioner treated these payments as gross income, allowing certain deductions therefrom to compensate the petitioner for the exhaustion of the contract. This action of the commissioner was premised upon the ground that the 1916 transaction was closed and completed on March 11, 1916, and that the contract with the Youngstown Company was the sole capital base for determining whether the returns therefrom were capital or income. In determining the fair market value of the contract, the commissioner estimated the total ore reserves in the mines to be 82,858,535 tons, the average annual production to be 1,841,300 tons, the life of the mines to be 45 years, and the probable total future receipts from the contract to be $5,965,814.52. Upon these hypotheses he determined the value of the contract according to Hoskold's formula to be $1,942,111.46, and allocated the petitioner's receipts therefrom to the return of capital and to income in the same proportion as the total capital to be recovered bore to the total anticipated receipts. These determinations resulted in the commissioner's making deficiency assessments against petitioner for the years in question. It is from an approval of those assessments by the Board of Tax Appeals that this appeal is prosecuted.

The commissioner did not fix the value of the Andrews Company stock as of March 1, 1913, and there is no finding of fact to the effect that petitioner's total anticipated receipts from the contract, added to his share of the $2,200,000, would exceed the value of the stock as of that date. Consequently, if the capital value which petitioner is entitled to have returned is the value of the Andrews Company stock as of March 1, 1913, there is no showing of any tax liability for any of the years here involved. It is the contention of the commissioner, however, that it was not necessary to value the stock as of that date, because that value could only be used as a basis for determining gains or losses on the stock when it was sold on March 11, 1916. He admits that the market value of the petitioner's interest in the contract, plus the cash which he received, did not exceed the March 1, 1913, value of the stock, but contends that that too only concerns the question of gains or losses on the stock. It was his position in making the assessment and is his contention here that the transaction of March 11, 1916, was a completed transaction in which petitioner converted capital consisting of stock into other capital consisting of cash and an income-producing contract, and that the contract thus acquired formed the capital base for determining whether the income which it produced were taxable gains or the return of capital.

By the transaction of March 11, 1916, the petitioner received, as part consideration for his stock, an income-producing contract. That contract, in our opinion, is indistinguishable in its legal aspects from the contract involved in Eldredge v. United States (C. C. A.) 31 F.(2d) 924, where the taxpayer assigned an option for a lease in consideration of a promise to pay two and a half cents per ton of coal mined if the assignee elected to take the lease. This court held in

that case that the contract right to the two and a half cents a ton of coal mined was property having an ascertainable market value within the meaning of the taxing statutes, and that the payments made thereon were in part return of capital and part income. We are aware, of course, of the inconsistency between that decision and the decision of the Second Circuit Court of Appeals in Logan v. Commissioner, 42 F.(2d) 193, where it was held that the payments made to certain former stockholders of the Andrews Company on the contract here involved were to be treated as capital payments until the entire capital value (it would seem the March 1, 1913, value of the Andrews Company stock) was paid in full. The Logan Case was decided, as stated by the court, upon the principle announced in the earlier decision of the same court in Warner v. Walsh, 15 F.(2d) 367. We had Warner v. Walsh under consideration in the Eldredge Case, and for the reasons given in the opinion in that case did not deem it controlling. Neither do we deem it applicable in the present case, for we think the fairer method of treating returns from a contract such as this is to apportion them to capital and income in the proportion that the total capital to be recovered bears to the total anticipated receipts. To follow the Logan Case in this case would require an abandonment of that view and the overruling of the Eldredge Case. This we would do if we thought the latter case wrong, but upon a reconsideration of it in the light of the arguments now made, we still believe that it was rightly decided and in the present circumstances is controlling. Compare Kosmerl v. Commissioner (C. C. A.) 25 F.(2d) 87; Ruth Iron Co. v. Commissioner (C. C. A.) 26 F.(2d) 30, and Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385.

From an examination of the evidence introduced before the board we find no reason for not accepting the findings of the commissioner with respect to the total ore reserves in the mining property, the probable average annual production, the life of the mines, and the probable total future receipts from the contract. We also accept the market value of the contract as determined by the commissioner according to Hoskold's formula. Pfleghar Hardware Co. v. Blair (C. C. A.) 30 F.(2d) 614; Eldredge v. United States, supra. It is insisted, though, that the proofs show that the contract was not capable of valuation in money because of the changing conditions in the steel industry, the dependency of the Youngstown Company's obligations upon the policies of the companies owning the controlling stock in the Mahoning mines, and the many uncertainties that arise in the operation of mining properties. Here again the finding of the commissioner is to be treated as prima facie correct (Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184; Austin Co. v. Commissioner, 35 F.(2d) 910 (6 C. C. A.)); and upon a consideration of the evidence we do not feel justified in overruling it. It was not necessary that the contract should be for sale or that there should be a known buyer for it before it could have a market value. Chicago Railway Equipment Co. v. Blair (C. C. A.) 20 F.(2d) 10. It is true that it was held in both Bourn v. McLaughlin (D. C.) 19 F.(2d) 148, and Tsivoglou v. United States (D. C.) 27 F.(2d) 564, that certain properties received in exchange for others had no realizable value in money's worth, and hence there was no taxable gain on the exchange. Those cases, however, turned on their special facts, and dealt with values for the purpose of determining losses or gains on the property given in exchange. In this case the value was fixed, not to determine gain or loss on the stock, but to apportion earnings from the contract to capital and gain. The necessity for ascertaining the value of capital consumed in producing income is obvious. It is a necessity that frequently arises and is clearly contemplated in the statutory provisions authorizing allowances for obsolescence, depletion, and exhaustion. Revenue Act 1918, § 214(a)(8) and (10), 40 Stat. 1067. The best methods that can be used are often lacking in demonstrable exactness. See United States v. Ludey, 274 U. S. 295, 47 S. Ct. 608, 71 L. Ed. 1054. The one used in this instance received the approval of this court in the Eldredge Case. We think it was fair, and we are also of opinion that the commissioner properly apportioned the receipts between capital and income.

The order is affirmed.