## PORTAGE SILICA CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5536.

Circuit Court of Appeals, Sixth Circuit.

Jan. 9, 1931.

Rehearing Denied June 30, 1931.

W. J. Dawley, of Cleveland, Ohio (Frank H. Pelton and Olive Payne Deering, both of Cleveland, Ohio, on the brief), for petitioner.

John V. Groner, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, C. M. Charest, and Percy S. Crewe, all of Washington, D. C., on the brief), for respondent.

Before DENISON, HICKS, and HICK-ENLOOPER, Circuit Judges.

HICKS, Circuit Judge.

Petitioner, Portage Silica Company, seeks a review of an order of redetermination entered by the Board of Tax Appeals sustaining a deficiency assessment in the sum of $7,974.76 of income and profit taxes for the year 1918. Petitioner has been engaged in the excavation and sale of sand and gravel since 1908. In 1908 and 1909 it acquired real properties at a cost of $40,892.87. Certain of these properties containing conglomerate consisting of sand and gravel were acquired at the cost of $31,740.87. Originally petitioner intended that its output be used in making concrete. This project proved unprofitable, but after experimentation it was developed that petitioner's sand had superior qualities for sand-blasting and steel-molding uses. To successfully prepare and market its sand for these purposes, it was necessary to either remodel the old plant or to construct a new one. A plan for a

new plant failed for lack of necessary capital. The old one as remodeled and electrified in 1911 and 1912 had a maximum capacity of 300,000 tons annually on the basis of day and night operation. At that time petitioner owed $305,395.64. For the year 1912 petitioner had one contract for a maximum of 30,000 tons of molding sand at 65 cents a ton f. o. b., only 23,000 tons of which were called for. In November, 1912, petitioner contracted to supply the same customer with 30,000 tons for the year 1913 at $1 per ton f. o. b., only 15,000 tons of which were delivered. During 1912 petitioner supplied a few other customers but refused to accept several contracts for lack of facilities to produce and deliver. In addition to the demand for its product, petitioner enjoyed a favorable location, good mining conditions, cheap transportation, and fair prospects. Such was the general situation beginning with the year 1913.

■ In its income and profit tax return for 1918 petitioner took deduction to the amount of $39,031.50 for depletion of 156,126 tons at 25 cents per ton. This was disapproved by the Commissioner and depletion was allowed upon the same tonnage at 5 cents per ton or $7,806.25. This readjustment gave rise to the additional taxes complained of. The assessment was prima facie right and the burden was upon petitioner to show before the board that it was wrong. U. S. v. Anderson, 269 U. S. 422, 443, 46 S. Ct. 131, 70 L. Ed. 347; Wickwire v. Reinecke, 275 U. S. 101, 105, 48 S. Ct. 43, 72 L. Ed. 184; Austin v. Comm'r, 35 F.(2d) 910, 912 (C. C. A. 6). As a basis it became necessary for petitioner to establish the fair market value of its silica deposits as of March 1, 1913. Revenue Act 1918, c. 18, § 234(a)(9), 40 Stat. 1057, 1078; Reinecke v. Spalding, 280 U. S. 227, 229, 50 S. Ct. 96, 74 L. Ed. 385; Merle-Smith v. Comm'r, 42 F.(2d) 837, 842 (C. C. A. 2). To this end it relied upon the "present value method" set out in article 206, cl. (b) et seq., Tr. Reg. 45, under section 234(a), supra, aided by Hoskold's Tables. Vital factors among others were:

(1) The total ton units of the recoverable conglomerate; (2) the estimated average annual output from March 1, 1913; (3) the useful life of the deposits from the same date; (4) the net profit for the entire period, that is, the selling price less the cost of placing the sand upon the market; and (5) the hazard.

The compact and well-defined form of the deposits and a thin overburden served to make the mining hazard almost negligible. There were admittedly 6,000,000 tons of the conglomerate. For the remaining factors petitioner relies principally upon an analysis found in the brief based largely upon the testimony of its vice president and general manager. This analysis sets up the estimated average annual production at 300,000 tons, the life of the deposit at 20 years, and the estimated average net annual income based upon 1912 operations at 66 cents per ton, or $198,000 or based upon the sale price of $1.20 per ton at 76 cents per ton, or $228,000.

By the aid of Hoskold's formula applied to the first estimate, petitioner arrives at a present worth of $2,115,796, and upon the second estimate at a present worth of $2,436,371, and upon said present worth estimates fixes a depletion rate at 32 cents and 36 cents, respectively. The striking differences in these estimates create a doubt as to the evidential value of either. It is noted that in the application of the Hoskold formula counsel used 6 per cent. and 4 per cent., which is permissible in the silica industry but C. S. Gilbert, petitioner's expert witness, testified that in the use of the formula he would use 8 per cent. and 4 per cent., which even for a 20-year period, would materially reduce the present value claimed for petitioner. It is also noted that the witness Gilbert furnished the Board with no estimate of present value.

■ But petitioner is confronted with a more serious obstacle. The record embraces a valuation schedule filed by petitioner with the Bureau on October 11, 1920. This schedule was sworn to by both its vice president and secretary. It appears therein that the estimated average annual production as of March 1, 1913, was only 115,000 tons; that the estimated life was 30 years; that the profit per ton for 1912 was $.087 or $8,716.70; and that the value of the deposits was $400 per acre, or $120,000. This schedule under a separate heading values the conglomerate in place at 27 cents per ton as of March 1, 1913, or at $1,620,000. Petitioner insists that this high per-ton valuation should have been accepted because the valuation per acre was simply an error. There was, of course, a wide discrepancy in the two valuations, but the valuation per acre was so particularized in the schedule as to lessen the probability of a mistake therein. The chance of a mistake is also discounted by the appearance twice in the schedule of a valuation of $250,000 assigned to the entire property of

petitioner, including its equipment. But the Commissioner was not compelled to adopt either the per-ton or the per-acre valuation in the schedule. His duty was to determine for himself a value upon which a willing seller and a willing buyer would have agreed after a fair consideration of any and all relevant factors. Reg. 45, art. 206, supra. He was confronted with a practical question and theories were only helpful as theories. It was his ultimate duty to determine a reasonable allowance for depreciation, i. e., such an amount as if allowed annually as the sand was sold would enable petitioner when the deposits were exhausted to have recovered the March 1, 1913, value free of taxes. Obviously this could not be arrived at to a mathematical certainty. See Hitchcock v. Comm'r (C. C. A.) 44 F.(2d) 756, decided November 5, 1930. It was a matter for sound judgment (see Williamsport Co. v. U. S., 277 U. S., 551, 562, 48 S. Ct. 587, 72 L. Ed. 985), and to his task the Commissioner is presumed to have brought the technical skill and knowledge of trained assistants.

The Board concluded that the failure of petitioner to erect a new plant in 1912 for lack of finances was inconsistent with its claim of 1913 value; that the anticipated output of 300,000 tons annually was not justified by the orders in hand or by the prospect for business; that there was no reasonable expectation that petitioner would be required by day and night shifts to produce 300,000 tons annually; and that the estimated annual profit of 76 cents per ton based upon 1912 operations, the cost of which was in turn largely based upon the estimated cost of labor for one particular day, was not altogether reliable in view of the $.087 profit per ton, exclusive of depletion, reported in the aforementioned schedule for the years 1912 et seq. We cannot say that the Board was unjustified. In addition, we think it might have properly concluded that a rise in values from $31,740.87 in 1909 to over $2,000,000 in 1913 was fanciful rather than real and based upon hope rather than upon favorable prospects. The Board no doubt gave due weight to the report of October 11, 1920, as to annual production and life of the property both of which factors materially affect the 1913 value and the depletion rate. The Commissioner's expert witness, Madison, fixed the March 1, 1913, value at $300,000, the annual output at 200,000 tons, and the approximate life of the property at 30 years. This evidence, although not specifically objected to before the Board, is challenged upon the ground that Madison considered developments subsequent to March 1, 1913, in violation of Reg. 45, art. 206, supra. This is a fault difficult to avoid and was indulged in to some extent by both parties. As an illustration, petitioner's estimated profit of 76 cents per ton was based not altogether upon the sale price per ton in 1913 but upon $1.20 the March sale price for the years 1913 to 1917, inclusive. But assuming the justice of this criticism it does not appear that Madison's conclusions were ever considered by the Commissioner. The record indicates that the Commissioner had assembled his data before May 20, 1924, and that no examination of the property or other investigation was made by Madison until October 3, 1924. His testimony was given in rebuttal, and we think that such portions of it as dealt with developments subsequent to March 1, 1913, were competent, at least, for whatever value they might have had in determining the soundness of petitioner's presumption. See Dwight & Lloyd Sintering Co., 1 B. T. A. 179, 185. The opinion of the Board of Tax Appeals indicates that this was the purpose for which it was admitted.

A further detailed discussion of the evidence introduced before the Board will serve no worth while purpose. The record in some of its aspects is somewhat confusing, but we have made a careful examination of it and find no sufficient reason for rejecting the allowance made by the Commissioner or disagreeing with the findings of the Board. Its decision is therefore affirmed.