## CHICAGO RY. EQUIPMENT CO. v. BLAIR, Commissioner of Internal Revenue.

Circuit Court of Appeals, Seventh Circuit. July 2, 1927.

No. 3853.

**1. Words and phrases—Ordinarily "hearing" means whole proceeding, including decision.**

As ordinarily used, "hearing" means whole proceeding, including decision therein.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Hearing.]

**2. Internal revenue ⬥25—Appeal may be taken from decision of Board of Tax Appeals, where whole proceeding, except the decision, was not concluded before passage of act making decision final (Revenue Act 1926, § 283[j]).**

Under Revenue Act Feb. 26, 1926, § 283(j), being 44 Stat. 65, providing that decision of

Board of Tax Appeals, rendered after the enactment of the act in cases where hearing was had before such enactment became final, appeal may be taken in any case where whole proceeding, except the decision, was not concluded before passage of act.

**3. Evidence ⬥596(1)—Every trier of facts should decide case on conviction reached from consideration of evidence.**

Every trier of facts should decide cases on conviction reached from consideration of evidence, and must be satisfied and convinced if the evidence adduced, fairly considered, preponderates for or against given proposition.

**4. Internal revenue ⬥25—Board of Tax Appeals is not authorized to adopt hard or unusual rules of evidence (Revenue. Act 1924, tit. 9, § 900 [Comp. St. § 6371⅝b]).**

Board of Tax Appeals, created by Revenue Act 1924, tit. 9, § 900 (Comp. St. § 6371⅝b), must make a thorough and careful examination of all facts, so as to reach just conclusion between taxpayer and government, and is not authorized to impose hard or unusual rules, that would exclude evidence competent and material under usual and ordinary rules of evidence, nor that would afford board the widest range of discretion.

**5. Internal revenue ⬥25—Board of Tax Appeals, under evidence, erroneously held certain accounts were not bad accounts and charged off as such (Revenue Act 1918, § 234[a], being Comp. St. § 6336⅛pp).**

Board of Tax Appeals, on appeal from Commissioner's assessment of additional tax, erroneously held that certain accounts of taxpayer were not bad accounts, and charged off as such within taxable year of 1918, pursuant to Revenue Act 1918, § 234 (a), being Comp. St. § 6336⅛pp, in view of uncontradicted evidence thereof.

**6. Words and phrases—"Market value," generally speaking, is price which one under no compulsion will take for property and another will pay.**

"Market value," generally speaking, is price which one under no compulsion is willing to take for property which he has for sale, and which another under no compulsion, being desirous and able to buy, is willing to pay for article.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Market Value.]

**7. Internal revenue ⬥25—Board of Tax Appeals erroneously rejected competent evidence of market value as of March 1, 1913, for purpose of determining depreciation allowance.**

Board of Tax Appeals, on appeal from Commissioner's assessment of additional tax *held* to have erroneously rejected evidence before it of market value as of March 1, 1913, for purpose of making depreciation allowance, in view of evidence establishing success of operation of taxpayer's business in 1913; it not being necessary that property be for sale before it can have a market value, nor that there shall be known buyer for it.

In Error to the United States Board of Tax Appeals.

Proceeding by David H. Blair, Commissioner of Internal Revenue, for the assessment of additional tax against the Chicago Railway Equipment Company. The Board of Tax Appeals sustained the Commissioner's finding assessing an additional tax, and defendant brings error. Reversed and remanded, with directions.

W. S. Oppenheim, of Chicago, Ill., for plaintiff in error.

L. C. Mitchell, for defendant in error.

Before ALSCHULER, EVAN A. EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. From the Commissioner's assessment of additional tax, plaintiff in error, called plaintiff, appealed to the Board of Tax Appeals, and this writ of error brings the matter here.

This court's jurisdiction is challenged on the ground that, when the provisions of section 283 (j) of the Revenue Act approved February 26, 1926 (44 Stat. 65), are applied to the facts, there is no right of appeal. Section 283 (j) is, in part, as follows: "In cases within the scope of subdivision (b) or (f) of this section where any hearing before the board has been held before the enactment of this act and the decision is rendered after the enactment of this act, such decision shall, for the purposes of this title, be considered to have become final upon the date when it is rendered and neither party shall have any right to petition for a review of the decision."

The facts are: Evidence was taken on February 2 and 3, 1926, and 45 days were given in which to file briefs and submit proposed findings of fact. The government's brief was filed March 2d, and that of plaintiff, together with its proposed findings of fact, was filed March 15th. July 28, 1926, findings of fact and an interlocutory opinion were filed, to which was ·added: "Order of redetermination will be entered on 15 days' notice, under rule 50." On November 4, 1926, an order was made, fixing the deficiencies.

[1, 2] Jurisdiction must depend on the meaning of the words "where any hearing before the board has been held." The government concedes that, as ordinarily used, a "hearing" means the whole proceeding, including the decision, but contends that the word can have no such meaning here, because the language of the act clearly indicates that the decision is no part of the "hearing." Ad-mittedly the government's contention leads it to the necessity of making the claim that, if any hearing had been in any way entered upon before the passage of the act, then, no matter how long it was carried on, or what was done thereafter, there could be no appeal. We think that is a too narrow construction, and are constrained to hold that there would be an appeal in all cases where the whole proceeding was not concluded before the passage of the act, so that it only remained to make the decision.

Plaintiff was a manufacturer of railway equipment, with plants in Michigan, Indiana, and Illinois, acquired and built between 1904 and 1915. In 1925, the Commissioner gave plaintiff notice of a finding of a deficiency in its income and profits taxes of $22,337.85 for 1917, of $85,815.59 for 1918, and $15,-609.91 for 1919. After appeal to and hearing by the Board of Tax Appeals, a finding was entered, approving the finding for the years 1917 and 1918, but fixing the 1919 deficiency at $6,309.16.

Three matters are here in issue on the merits: (a) Was the item allowed for bad debts properly transferred from 1918 to 1919? (b) Was there error in fixing the value of depreciable property? (c) Were the rates of depreciation used erroneous? Before discussing these questions, we deem it proper to make some comment upon parts of the government's brief.

The board was created by title 9, section 900, of the Revenue Act of 1924 (43 Stat. pp. 253, 336 [Comp. St. § 6371⅚b]). Paragraph (h) of section 900 provides, in part: "The proceedings of the board and its divisions shall be conducted in accordance with such rules of evidence and procedure as the board may prescribe." Rule 20 is the only one quoted in argument. It reads: "Upon hearings of appeals, the taxpayer shall open and close, and the burden shall be on him."

With this rule no fault can be found, but decisions of the board are cited in which it is said: "The taxpayer must adduce legal, admissible, and convincing evidence of error to sustain his appeal." Upon this, counsel observe: "It will be noted from these decisions that the required degree of proof was proof by 'satisfactory' and 'convincing' evidence. The evidence necessary to sustain an appeal must be legal and admissible, and in addition must be 'convincing.' It is clear that this requirement is different from, and may go further than, a burden of merely presenting some evidence or a preponderance' of evidence. In presenting an appeal it is incumbent on a taxpayer to produce legal,

admissible evidence sufficient to convince the board that his appeal should be sustained."

Again, commenting upon authorities cited that state the well-known general rule that, where the evidence in the trial court is conflicting, it will not be disturbed upon appeal, counsel say: "It is submitted that the foregoing decisions, involving appeals from federal District Courts, apply with even greater force to the present appeal from the decision of the Board of Tax Appeals in a case tried under the act of 1924. This by reason of the fact that the board was authorized to adopt its own rules of evidence, and did adopt a rule affording the widest range of discretion. The federal District Courts are bound by rules of evidence of narrower limitations than the limitations applicable to the board under the Revenue Act of 1924 and the rules of evidence adopted under the authority of that act."

[3] Of course, every trier of fact should decide cases upon a conviction reached from a consideration of the evidence, and clearly evidence that produces such conviction must be satisfactory and convincing; but it is a well-known rule of law that triers of fact must be satisfied and convinced, if the evidence adduced, fairly considered, preponderates for or against a given proposition. When the evidence before a trier of fact ought to be convincing, he may not say that it is not. Whether he is a judge or a commissioner, the facts must be fairly and judicially weighed, and a determination reached thereon.

We see nothing in the act which would authorize the board to adopt rules "affording the widest range of discretion." The board would have no right to adopt a rule that did not require the board to consider all the evidence and then to exercise a sound discretion in reaching its conclusions. Nor would it have a right to prescribe rules that would exclude evidence competent and material under the usual and ordinary rules of evidence applicable in the courts.

The board is an instrument of government, established to make inquiries and determinations between a citizen and his government in tax matters. In many cases, as in this case, the board is dealing with facts and conditions from 7 to 15 years in the past, and arising under laws that were passed and very imperfectly administered under war conditions. The difficulties of administering the law, on the part of the government, and of complying with it, on the part of the citizen, were and are very great. Some indication of this may be found in the fact that

it was in March, 1925, before the Commissioner arrived at a deficiency tax for 1917.

[4] We are of opinion that there is nothing in the situation which either permits or requires hard or unusual rules to be made or applied by the Board of Tax Appeals, but that it was the intent and purpose of the law that the board should make a thorough and careful examination of all the facts, so as to reach a just conclusion between the taxpayer and his government. In article 165 of Treasury Regulations 69, it is said: "While the burden of proof must rest upon the taxpayer to sustain the deduction taken by him, such deductions must not be disallowed, unless shown by clear and convincing evidence to be unreasonable."

(a) In the Revenue Act of 1918 (40 Stat. pp. 1057, 1077, 1078 [Comp. St. § 6336⅛pp]) it is provided:

"Sec. 234 (a). That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:  *  *  *

"(5) Debts ascertained to be worthless and charged off within the taxable year."

The government contends for a construction of this section that would require, not only that the debt should be ascertained to be worthless, and that the determination to charge it off should be reached within the taxable year, but that, in the matter of auditing and accounting, the entries must actually be made within the taxable year. Despite the fact that it appears from the testimony of plaintiff's auditor Forward that he was in the army, in France, from August, 1917, until July, 1919, and had, and could have, no knowledge as to when the charging-off entries were actually made, counsel places great stress upon the fact that he said that the entries were not made until January or February, 1919. The only other witness testifying on that point said: "During the year 1918, we charged off something like $60,000; that is, at the expiration of 1918."

[5] It seems that the uncontradicted evidence shows that the items charged off, to the extent to which they were allowed, were so bad in 1918 that rightfully they might have been charged off. The determination to do so was reached in 1918, and, fairly considered, we believe there is no contradiction of the testimony that they were charged off during the taxable year. We are of opinion that it was error to hold that they were not bad accounts and charged off within the taxable year 1918. Ordinarily it might make no difference whether the charge-off was allowed for one year or another, but in this case the

tax upon plaintiff in 1918 was 80 per cent., and in 1919 only 20 per cent.

(b) In Treasury Regulations 45, relating to the Revenue Act of 1918, dealing with deductions allowable to corporations under section 234a (7), it is said that they are the same as allowed to individuals, and reference is made to article 161, where it is said: "The proper allowance for such depreciation of any property used in the trade or business is that amount which should be set aside for the taxable year in accordance with a consistent plan by which the aggregate of such amounts for the useful life of the property in the business will suffice, with the salvage value, at the end of such useful life, and provide in place of the property its cost, or its value on March 1, 1913, if acquired by the taxpayer before that date."

Article 164 says: "In case of property acquired by the taxpayer prior to March 1, 1913, the capital sum to be replaced is the fair market value of the property as of that date. In the absence of proof to the contrary, it will be assumed that such value as of March 1, 1913, is the cost of the property less depreciation up to that date. To this sum should be added from time to time the cost of improvements, betterments, etc."

There is nothing to show the method pursued by the Commissioner in arriving at the value of the property to be depreciated, other than that which is disclosed in the opinion of the board. After saying that the Commissioner declined to approve the claim of plaintiff as to the values of March 1, 1913, it says: "Instead, he [the Commissioner] computed the allowance for exhaustion, wear and tear of the buildings, machinery and equipment upon the basis of undepreciated cost on March 1, 1913, plus the cost of additions since that time, as representing, in the absence of better evidence, the fair market price or values on March 1, 1913."

After making some reference to the evidence before the board, the opinion says: "No evidence of any character was submitted showing the fair market price or values of the properties in question on March 1, 1913, or as showing that the taxpayer's method of determining the value on March 1, 1913, upon the basis of cost of reproduction less depreciation in any way represented the fair market value on that date." That there was no such evidence is urged by the Commissioner.

In one decision by the board, cited by the Commissioner, it is said: "Value is what the property is worth. It is what it would bring in the open market, if offered for sale by an owner willing, but not compelled, to sell to a purchaser willing, but not compelled, to buy. Value is frequently affected by things far removed from depreciation or cost. * * * Value results largely from demand or earning power, which may or may not be the same thing. It is commonly affected by periods of prosperity or financial depression." Those expressions, taken in connection with the conclusion by the board that there was no evidence in this case of any character showing the fair market value as of March 1, 1913, indicate that the board disregarded competent and material evidence bearing upon the market value as of that date.

[6] Market value, speaking very generally, may be said to be the price which one, under no compulsion, is willing to take for property which he has for sale, and which another, under no compulsion, being desirous and able to buy, is willing to pay for the article. But market value is so dependent upon times, places, conditions, and people that that which is a good rule in one case may be no rule under other circumstances. For instance, staple articles of merchandise, such as fuel, clothing, or food, at most times and places have a well-known market value; but the market value of plants used for manufacturing purposes, or buildings equipped for special business or commercial purposes, are affected by many conditions. See Muser v. Magone, 155 U. S. 240, 15 S. Ct. 77, 39 L. Ed. 135.

In this case, the evidence shows that plaintiff was organized in 1892, and commenced operation in a comparatively small plant in the city of Chicago. During the years 1900 and 1904 it erected a building and equipment in Detroit, Mich., at an expense of $40,000. In 1905, it acquired a building in Grand Rapids, Mich., for $62,500, which was put in condition and then appraised at $130,000. In 1907 it acquired a plant at Marion, Ind., for $97,000, that was appraised in 1907 at $185,000. Those two plants were acquired from bankrupt institutions. In 1907 it erected a plant in Chicago at a cost of $353,338.57. In 1912, it acquired another bankrupt plant in Franklin, Pa., at a cost of $175,000, the major portion of which was destroyed by fire in 1913. During 1913 and 1914 a corrugated iron structure was erected at what is called a reproductive value of $163,000. There was also built, in 1913 and 1914, at Franklin, a brakebeam plant for $131,931.50.

It thus appears that in the 21 or 22 years from 1892 to 1914, plaintiff, from the operation of the small plant, costing $26,000

and since abandoned, built and acquired plants, the buildings and equipment of which cost it $736,951, and if there is added the difference between the cost to plaintiff of the Marion, Ind., and the Grand Rapids bankrupt plants, and the appraised value thereof, made shortly thereafter, the value, measured by the cost to construct, would be but little under $900,000—approximately $195,000 of which was put into the two Franklin plants in 1913 and 1914.

It is urged that there is no evidence to show whether the properties were operated profitably or otherwise in 1913. Plaintiff was buying and building new plants right up to and in the years 1912 and 1913. It does appear that they shipped annually, during the years 1914, 1915 and 1916, 125,000 tons of their manufactures. The business started in a small way, and the record shows that in December, 1917, it had capital invested $4,796,997.12. It had then a capital of nearly $2,500,000, and a surplus of over $1,356,000. A considerable income tax for 1916 is shown. Plaintiff was taxed for 1917, on income, $120,000, and, for 1918, $145,000, and there is now claimed for those years $108,000 more. It is not disputed that they expended in 1912, 1913 and 1914 nearly $200,000 in new properties and buildings.

We are of opinion that those and other matters pretty conclusively show that the business must have been in successful operation in 1913. Assuming that it was the duty and the intention of the Commissioner to arrive at the value of plaintiff's property for the purpose of establishing the depreciation allowable because of exhaustion, we must also assume that inquiries were made concerning conditions on March 1, 1913. The schedules made by revenue agents and filed with the Commissioner's answer here, show that those agents made exhaustive investigations into plaintiff's business. It is not possible that in their investigation they remained ignorant of so many of the facts above herein recited, and, if so, they must have had, and the Commissioner must have had, evidence of market value on March 1, 1913.

[7] It is not necessary that a property shall be for sale before it can have a market value. Neither is it necessary that there shall be a known buyer for it. All the properties had, within 13 years, been purchased in the market. Two of them were purchased within about a year of March 1, 1913. These properties were a part of a prosperous and going concern, and were adapted to the purpose

for which they were used. We are of opinion that the board could not disregard the obvious, and say it had before it no evidence of March 1, 1913, value, and that the board erred in rejecting the evidence before it of a market value.

(c) Whether the depreciation rates applied were in any sense erroneous, unless possibly in the single instance of giving the corrugated iron building the same rate as the concrete, is doubtful. The witness Forward, who knew most about the rates, said the item scheduled as "power" had a normal useful life of 20 years, and machinery of 10 years, and they were given, respectively, a 5 per cent. and a 10 per cent. rate. He agreed to 20 per cent. for the automobiles. Unless there is something to contradict the Forward testimony as to the corrugated iron building, it would appear that should have a depreciation rate of 5 per cent. We do not think there should be an increase of 50 per cent. because of the additional operation of machinery during the years in question.

The case is reversed and remanded to the Board of Tax Appeals, with direction to take further evidence, if necessary, on any question, and to fix the market value as of March 1, 1913, and, further, to base the depreciation thereon in accordance herewith, and to allow the charge-off of bad accounts for the year 1918.