## CHICAGO RAILWAY EQUIPMENT CO. v. COMMISSIONER OF INTERNAL REVENUE.

### Nos. 4225, 4226.

Circuit Court of Appeals, Seventh Circuit.

March 27, 1930.

William S. Oppenheim, of Chicago, Ill., for appellant.

John V. Groner, of Washington, D. C., for appellee.

Before ALSCHULER, PAGE and SPARKS, Circuit Judges.

PAGE, Circuit Judge.

No. 4225. In Chicago Ry. Equipment Co. v. Blair, 20 F.(2d) 10, where most of the facts appear, we reversed the order of the Board of Tax Appeals (Appeal of Chicago Ry. Equipment Co., 4 B. T. A. 452), which sustained assessments of additional taxes for the years 1917, 1918, and 1919.

On the second hearing, the Statute of Limitations was pleaded, new evidence was taken, an order sustaining the assessments entered, and petitioner again asks for a reversal.

That the assessments for the years 1917 and 1918 were made after the statute had run, unless saved by waivers, is admitted. Petitioner admitted a waiver on December 10, 1925, long after the statute had run.

The Board has held that the burden is upon the Commissioner to prove a waiver. Bonwit Teller & Co. v. Commissioner, 10 B. T. A. 1300; Farmers Feed Co. v. Commissioner, 10 B. T. A. 1069; Stevens v. Commissioner, 14 B. T. A. 1120. Respondent offered no evidence of a waiver. The evidence shows the waiver of December 10, 1925, and two letters written to petitioner by the Revenue Department, both after the statute as to the 1917 and 1918 taxes had run, stating that waivers had been filed.

The Board held the assessments legal on the theory that: (a) The statements in the letters were evidence that waivers had been made; (b) a waiver at any time is a sufficient basis for an assessment.

We are of opinion that the letters were not even evidence that waivers had been made, and certainly they were no evidence of the time when they were made, or when they expired, or of any other fact. Such waivers were so obviously a part of respondent's case that the only inference to be drawn from his failure to produce them is that they did not exist.

It is urged, on authority of Insley Mfg. Co. v. Thurman, 33 F.(2d) 441, decided by this court, that a waiver, after the statute has run, is good. While in that case there was such a waiver, it was made while a former waiver, made before the statute had run, was still in force. The question here was not there decided, nor was it before us.

In Pictorial Printing Co. v. Commissioner, 38 F.(2d) 563, decided February 28, 1930, we had before us the question as to whether a waiver, made at a time when the Commissioner had no authority to assess the tax in question and the taxpayer was under no obligation to pay it, had any force. We there held that no valid waiver was shown, and we here hold that the statute had run as to the 1917 and 1918 assessments. No such error is assigned as to the 1919 assessment.

It is urged that the Board erred in fixing the March 1, 1913, fair market value of petitioner's properties, consisting of large factory buildings and equipment, located in five states.

The plants were bought between 1892 and 1912, from older concerns, some of them from receivers or trustees, and at prices much below the original cost. From time to time large sums of money were spent upon the properties for buildings, renewals, and repairs.

Appraisals prior to 1913 showed a property value of $334,244.09 greater than the cost of the properties to petitioner, and the book values were increased by that sum.

Respondent, apparently ignoring the question of March 1, 1913, fair market value, proceeded to find the cost of the properties on December 31, 1916. The parties undertook before the Board to establish the March 1, 1913, market value.

The evidence before the Board shows several sets of figures bearing upon values.

(1). It is admitted that the cost of the properties as of Dec. 31, 1916, was...............$1,384,034.11
There was expended on the properties between [1] Jan. 1, 1913, and Dec. 31, 1916.....$ 385,441.05

So that the cost March 1, 1913, was, .....................$ 998,593.06
If we add the amount put on the books because of the appraisals prior to 1913 and above referred to,..........$ 334,244.09

We have, as the March 1, 1913, undepreciated value, as shown by those figures,...........$1,332,837.15
Four of the appraisals prior to 1913 were made as early as 1908, and the last one in 1912. The above figures aid but little in finding the March 1, 1913, market value.
(2). Coats & Burchard, between Nov. 27, 1915, and Feb. 1, 1916, appraised all of petitioner's properties. Those appraisal books are not before us, but the appraisals purport to show the reproduction cost, new, of all properties at that time. Such cost was, .....................$1,720,884.47
By deducting additions for 1913, 1914 and 1915, amounting to, $ 326,130.75

We have the March 1, 1913, reproduction value, as,........$1,394,753.72
Forward testified he thought Coats & Burchard depreciation figures were...........$ 262,000.00

So that, on those figures, the March 1, 1913, depreciated value was, ................$1,132,753.72

[1] In cases where we have made deductions of expenditures on the properties made after Jan. 1, 1913, we have deducted the whole of the 1913 expenditures, because expenditures, if any, for the months of January and February, 1913, do not separately appear.

(3). Petitioner's president Leigh testified that he knew the fair cash market value of the properties March 1, 1913, and stated that it was $1,536,323. Forward testified that the properties on that date were worth $1,584,926.13—some $48,000 higher than Leigh. If Leigh gave the details of his figures, we have not been able to identify them. He did, however, give what he said were figures in the Coats & Burchard appraisals, showing a total of $1,782,939. He testified that those figures represented the fair reproduction value of those properties at that time. If we deduct the additions in 1913, 1914, and 1915, $326,130.75, there remains as of March 1, 1913, $1,456,808.25, as Leigh's idea of the Coats & Burchard 1913 reproduction value. That was nearly $100,000 less than Leigh testified was the March 1, 1913, fair cash market value. Leigh had not appraised the properties. His testimony, above referred to, may be explained by his testimony elsewhere—that he did not think there was much difference between the fair market value and the reproduction value. He also said his figures were identical with Coats & Burchard's. Forward's situation is much the same as Leigh's. He testified: "I have not made any independent appraisal of any property other than on certain items in the plant." He took his figures from the books and appraisals made by others.

(4). The record shows various balance sheets, beginning in 1908, that purport to show gross reproduction values. Depreciation reserves are there stated in gross. The Board had before it the details of those balance sheets, but they are not before us.

■ With their appraisal, Coats & Burchard prepared a depreciation sheet that was in petitioner's possession, but that was not offered in evidence before the Board on either hearing. The presumption is that it was unfavorable to petitioner. This presumption is strengthened by the fact that the Coats & Burchard figures, on one Chicago property, show a depreciation of about 25 per cent. All properties, figured on that basis, would show a depreciation much greater than the amount stated by Forward to be his recollection of what the Coats & Burchard depreciation figures showed.

The Board gave full consideration to all the evidence, and out of all the conflicting evidence reached a conclusion as to the 1913 market value that must be sustained.

For the purpose of arriving at the taxable value of the plant equipment, it was agreed that equipment classed as "power" should be depreciated 5 per cent., and that classed as "machinery and tools" 10 per cent. Petitioner's complaint is that $239,677.35 worth of equipment that should have been classed as "machinery and tools" was erroneously classed as "power," thereby depriving petitioner of a 5 per cent. depreciation on that amount.

In arriving at a proper depreciation percentage on such a large amount of equipment, located in five different states, it is quite manifest that the useful life of individual items could not be determined. Coats & Burchard, in their appraisal, listed 29 lots. Some of those lots are: Electric lighting system, $15,624.69; flasks, $35,092.05; furnaces and forges, $130,551.21; miscellaneous, $40,857.79, etc. No detail is before us. Possibly the first item is power. Without further information, it is doubtful if anyone could, with a feeling of confidence that he was right, say to which class the other three lots should be assigned. It was necessary, arbitrarily, to make classes into which the items of the equipment could be placed, because many of the items could not be identified as belonging to one class or another, except on the theory that it was entitled to the depreciation fixed for that class. The testimony is unsatisfactory. Forward said, "I include in power the boilers and engines." The witness and respondent got into a controversy over what was power and what was machinery and tools. We have here no information upon which to determine that question. The Board gave every opportunity for a full hearing, and was liberal in the admission of evidence. We find no basis for disturbing its finding on the classification for depreciation purposes.

The order is affirmed as to the 1919 taxes, and reversed as to the 1917 and 1918 taxes.

No. 4226. There is in this case no issue on the Statute of Limitations. Otherwise, the issues are the same as in No. 4225, and are determined by our decision in that case.

The order of the Board of Tax Appeals is affirmed.