**NOLTING v. TAIT, Commissioner of Internal Revenue.**

**SCARFF v. SAME.**

District Court, D. Maryland.

June 7, 1933.

Emory H. Niles (of Niles, Barton, Morrow & Yost), of Baltimore, Md., for plaintiffs.

Simon E. Sobeloff, U. S. Atty., and Charles G. Page, Asst. U. S. Atty., both of Baltimore, Md., for defendant.

CHESNUT, District Judge.

These two cases involve the personal income tax returns of William G. Nolting and John H. Scarff for the taxable years 1928 and 1929. The plaintiffs constitute the firm of Wyatt & Nolting, well-known architects of Baltimore city. They claim that overassessments were made by the Commissioner of Internal Revenue for each year in the case of each taxpayer, and petitions for refunds were duly made and disallowed, and these suits instituted. The amount of the claimed overassessment in the case of Mr. Nolting for 1928 was $8,315.44, and for 1929 was $421.69; and in the case of Mr. Scarff the amounts were $1,112.26 for 1928 and $6.86 for 1929, including interest in both cases. The items in controversy in both cases rest upon the receipt by the partnership of $70,000 par value of preferred stock from the Gillet Realty Corporation during the year 1928, and $5,000 par value of the same stock for the year 1929, for services as architects. Each of the partners was entitled to a distributive interest in the shares of stock so received by the partnership for the respective years, and the amount and value thereof as determined by the Commissioner was the basis for the alleged overassessment. The taxpayers did not include the value of their respective interests in the stock because they took the legal position that as the stock had no fair market value and was purely of a speculative value, it was not taxable as income until disposed of or its fair market value otherwise established. In taking this position they acted in part on their understanding of an opinion to that effect given by a field agent of the Internal Revenue Department who was examining their tax returns for a previous year. The Commissioner, however, finally ruled that the value of the stock was ascertainable and the distributable interests of the respective partners therein was included by him in their individual returns and the extra assessments then followed.

The facts relating to the stock were substantially as follows: In 1927 Mr. Nolting, an experienced architect, who had previously been interested in the construction of certain apartment buildings in Baltimore city (as well as other building enterprises), conceived the idea that under the conditions then prevailing there would be a real demand in Baltimore city for a new apartment house of a character more luxurious than any theretofore built, carrying rentals for apartments at the rate of $4,000 to $6,000 per year, which were substantially larger rentals than were currently being received by other apartment houses. With this plan in view he conferred with Gillet & Co., bankers and brokers, in Baltimore city, and successfully interested them in the project and they agreed to finance it. Finally a six-party agreement was entered into dated October 28, 1927, between (1) Gillet & Co., bankers; (2 and 3) George W. Hyde and wife (owners of the property purchased for the apartment house site); (4) William G. Nolting, trading as Wyatt & Nolting, architects; (5) Consolidated Engineering Company (as builder); and (6) one Saxe, as engineer. The agreement provided for the formation of a new corporation under the laws of Maryland to be known as the Gillet Realty Company, to build and own the apartment house, with authorized capital stock consisting of 5,000 shares of common with no par value, and 5,000 shares of 7 per cent. cumulative preferred stock, par value $100 each (subsequently duly increased in amounts); the corporation to make a bond mortgage for $1,000,000 par value of 6 per cent. bonds to be sold by the bankers at not less than $100 and accrued interest; the preferred stock to have no voting power until default in three dividend payments, to be redeemable at 107½ per cent., plus accrued and unpaid dividends, and to be preferred both as to principal and dividends over the common stock, all the common stock to be issued to the bankers for necessary expenses to be advanced by them. The real estate was to be purchased from Hyde for $120,000, payable $70,000 in cash and $60,000 in first preferred stock. Wyatt & Nolting as architects were to be paid $70,000 for their services in preferred stock at par value. The builder was to be paid the net cost of the building plus a commission of 7½ per cent. in preferred stock. Wyatt & Nolting also agreed to subscribe and pay for $7,000 par value of the preferred stock at par, and the builders to subscribe and pay for $13,000 at par. The services of the architects were to be rendered in accordance with the American Institute of Architects Documents. Saxe, in consideration of employment and payment by Wyatt & Nolting, as engineer, and in further consideration of the use in the building of a certain floor con-

struction system (which netted $5,000 or $6,-000 in cash to him personally), agreed to subscribe and pay for $20,000 of the preferred stock at par.

The plan as provided for in this contract was duly carried out. The new corporation, the Gillet Realty Corporation, was formed, its stock authorized to be issued, the land was acquired and paid for as agreed upon and the building erected and the stock of the corporation issued during the year 1928 to the parties entitled thereto. The building was substantially completed in December, 1928, and some of the tenants had previously moved in. The property became known as the Warrington Apartments situated at 3908 N. Charles street, the best residential district of Baltimore city. It is known in fact as probably the best apartment house in Baltimore. The lot was approximately 262-foot frontage on the west side of N. Charles street, by 300 feet deep. The total cost of the building, including the architects' and builders' fees paid in stock, was approximately $1,300,000. The bonds were all sold and paid for at par and the bankers, being the sole owners of the common stock of the corporation, paid the expenses of the sale personally. The bankers subscribed and paid for in cash $100,000 preferred stock at par; they also, in addition to 1,500 shares of common stock issued to them in accordance with the contract, bought additional 2,000 shares of common stock at $50 per share and paid for it in cash. The bankers also owned equities in the Latrobe Apartment House on the northeast corner of Read and Charles streets, in Baltimore city, and in the Gillet Building at the southeast corner of Light and Redwood streets in Baltimore city. The equity in these buildings during 1928 was conveyed to the Gillet Realty Company for $190,000 par value of preferred stock and $25,000 of common stock of the Gillet Realty Company.

In the bond prospectus the land and improvements, when completed, were stated to be valued by Wm. E. Ferguson & Co. at $1,-625,000. The estimated annual earnings from rentals were as follows:

Gross rentals .................$256,670.00
After deducting 10% for vacancies ....................... 231,000.00
Operating expenses and taxes, etc. estimated at............. 67,500.00
Interest on first mortgage bonds.. 60,000.00
Leaving a net income, after amortization of not less than $20,000, .................... 83,500.00

The onset of the financial depression in 1929, when the building had been fully completed for less than a year and the space therein never fully rented, frustrated the plan and the reasonable expectation of the promoters of the enterprise. The gross rentals per year have never even approximated the estimated amount. During the few years of the operation of the building it has just about earned the interest on the bonds without previous allowance for depreciation. $40,000 of the bonds have been retired. Very recently the company has announced at least a partial default in the payment of interest on the bonds.

The Gillet Realty Company paid three semi-annual dividends on its preferred stock which, however, would not have been earned fully, and possibly not at all, if proper depreciation charges had been set up. Some few dividends have been paid in stock. The earnings of the apartment house have to some extent been supplemented by some income from the other properties. A financial statement of the corporation for 1928 and 1929 shows the book value of the preferred stock equal to par or better.

In agreeing to accept $70,000 of preferred stock for their architects' fee, Wyatt & Nolting were actuated by the consideration that 6 per cent. in cash was the customary reasonable charge for architects' services for a similar building enterprise, and, as they regarded this particular project as a speculative one, they asked and received payment in stock on the basis of a fee of 7 per cent. It is customary for architects employed in Baltimore city to receive, if demanded, 20 per cent. of their total fee upon approval of preliminary plans and an additional 40 per cent. when final and detailed plans and specifications are completed, and the balance as the work progresses to completion pro rata to payments to the builder. In this case Wyatt & Nolting made no earlier demand for any stock or other compensation but did in fact receive the $70,000 of preferred stock as agreed upon on December 31, 1928. The partnership books are kept on the accrual basis and there is a notation for the 1927 earnings of the firm that 290 shares of the stock were receivable at the end of 1927 and 410 shares were receivable at the end of 1928. Instead of one certificate for the whole amount being issued to the partnership, the pro rata interests of the two partners were issued separately to them, but it is clearly established that the title to the stock came only through the partnership. There is evidence

that the preliminary plans for the building were completed and approved during 1927 and the final detailed plans above referred to completed in January of 1928.

Shortly after Wyatt & Nolting received the stock the partners respectively made inquiries as to the possibility of selling the stock and found as a practical matter that they could not sell it at any reasonable price. They did not set a price upon it and give an unrestricted order to any one to sell for their account. The stock was not listed on any exchange. But during December of 1928 Gillet & Co. sold to various customers, mostly in small lots, about $200,000 par value of the stock at par.

A number of experienced stockbrokers testified for the plaintiffs that they knew of no market value or market for the stock of the Gillet Realty Company and under conditions pertaining to the company during 1928, would not be able to determine the market value of the stock and did not think it could be sold. Their general view was that until the corporation could demonstrate its net earning capacity from its properties, the value was too uncertain to be made the basis of a market for the stock.

During the years 1930 to 1932, inclusive, there were a few sales of the preferred stock by individual stockholders, some at $80 per share and some at $40 per share, but the circumstances applying to each were so peculiar that no general conclusion as to market value can be based thereon. Although both Messrs. Nolting and Scarff made some efforts to sell their stock, or inquiries as to its saleability, neither made any determined effort to sell the stock at any particular price with the exception that in 1932 Mr. Scarff did definitely offer some of his stock for sale at $50 per share but could find no purchaser. He frankly testified that in 1928 he would not have been willing to sell the stock at $50. And the same conclusion is inferentially true with regard to Mr. Nolting.

The actual expenses incurred by Wyatt & Nolting for their architects' work in the building of the Warrington Apartments, with a reasonable allowance for office overhead, was figured by them at $24.55 per share for the preferred stock.

The total cost of the Warrington Apartments was more than $1,000,000, and after the completion of the building in 1929, Wyatt & Nolting asked for additional compensation based on extra work, in consequence of which they were given 50 additional shares of the preferred stock, the receipt of which item constitutes the basis of the alleged overassessment by the Commissioner for the year 1929 to the two partners for their individual taxable incomes.

In this detailed statement of the substance of the testimony in the case, including the exhibits, some summarized conclusions of fact can be deduced as follows:

(1) The preferred stock of the Gillet Realty Company at no time during 1928 had a readily ascertainable market value and indeed no general market value at all in the sense of actual sales of the stock other than original subscriptions at par, and the sales by the bankers to their particular customers.

(2) With the exception of the customers of Gillet & Co. who bought approximately $200,000 of the preferred stock at par, the other subscribers to the preferred stock were all actuated by special collateral considerations. Thus Wyatt & Nolting had an established architectural office which made it desirable for them to have work to do to keep their draughtsmen and other employees occupied and were willing to accept payment for services in stock rather than in cash with the hope and prospect that it would ultimately have a substantial realizable cash value. Similar considerations evidently influenced the Consolidated Engineering Company. The owner of the land, Mr. Hyde, received in cash $70,000 (approximately the assessed value of his property on the tax books based on the assessment of 1925 in Baltimore city where the law requires and the practice in substance conforms to 100 per cent. valuation) and $60,000 in stock. Mr. Gillet, the president of Gillet & Co., testified that the total agreed upon price of $130,000 for the property payable $70,000 in cash and $60,000 in preferred stock, was probably $25,000 to $30,000 more than the then saleable value of the property. Mr. Saxe was influenced to some extent by the consideration that he would be employed as engineer for the building and would be able to use in the building material constructed in accordance with a special patent for floor material which he was representing in Baltimore. Gillet & Co., as bankers, were obviously affected largely by the consideration that they would be the sole owners of the common stock and therefore of the equity in the whole proposition, and as bankers would probably be able to resell the preferred stock to their customers. The customers in purchasing from the bankers were doubtless influenced largely by the advice of the bankers

and the true representation that the stock was being sold by Gillet & Co. at its actual cost price to them.

(3) But while there was no market value for the stock based on free sales and purchases in the market during 1928, the preferred stock obviously had a very substantial intrinsic value and its book value as of September 30, 1929, as appears from balance sheets of competent accountants, was at least equal to its par value. The total cost of the Warrington Apartments, including land and buildings from Hyde, the architects' and builders' fees represented in stock at reasonable amounts for these services, was approximately $1,300,000. The total cash proceeds of the $1,000,000 bond issue, all sold at par without usual expenses of bankers' discount, went into the building without waste or water. And the preferred stock not issued for services as above referred to was subscribed and paid for in cash at par including $100,000 in cash subscribed and paid for by the bankers. Additional preferred stock was issued in the amount of $190,000 par value for equities in two other buildings in Baltimore city which were not shown by the testimony to have been in value less than the par of the stock so issued. And in addition, Gillet & Co. had subscribed and paid in cash $100,000 for 2,000 additional shares of the common stock of the corporation. It thus appears that the corporation had received for its bonds and stock at their par value, property and services reasonably worth not less than the par value of the bonds and stock and in addition thereto, at least $100,000 of cash had been paid into the corporation for the junior security of the common stock. The result would seem clearly to be that in December, 1928, the corporation owned property which at fair valuations at that time exceeded the par value of its bonds and preferred stock outstanding. What the actual net earnings of the corporation would be was, of course, speculative in the sense that the actual earning capacity depended on the future. But its assets consisted of well-known property in the heart of the residential and business districts of Baltimore city acquired at fair valuation then current. These properties, other than the Warrington, had established earning capacities. The only uncertain feature under then existing conditions lay in the consideration that the design and plan of the apartments in the Warrington were on a more luxurious scale and were expected to command substantially higher rentals than previously had been received from apartment houses in Baltimore city, and the building

was therefore more costly than other apartment houses furnishing less luxurious accommodations. But that the plan would be successful was believed in good faith and in the exercise of good judgment by the principal promoters of the project, including experienced architects, builders, and bankers.

(4) Under economic conditions now prevailing the carefully devised seemingly prudent plan has proven unsuccessful but this is apparently due not to the original unsoundness of the plan as conceived and executed, but to the sharp change in economic and financial conditions which began in October, 1929, and which of itself is certainly a sufficient reason for the failure of this new high-class apartment building to be financially successful. If conditions which have prevailed in the last three years could have been anticipated by the promoters of the project, it is utterly improbable that it would have been carried through at that time.

■ I turn now to the consideration of the law that must control the disposition of the cases. It is the main contention of the taxpayers that the stock was not taxable at all in 1928 because it had then no fair market value. And in support of this contention counsel for the taxpayers rely upon the following cases: Schoenheit v. Lucas (C. C. A. 4) 44 F.(2d) 476 (applying the 1918 act); Rice v. Commissioner (C. C. A. 1) 47 F.(2d) 99 (applying the 1924 act); Mount v. Commissioner (C. C. A. 2) 48 F.(2d) 550 (applying the 1918 act); O'Meara v. Commissioner (C. C. A. 10) 34 F.(2d) 390; Nichols v. Commissioner (C. C. A. 3) 44 F.(2d) 157. With the exception of the last case cited, these decisions were all made under that section of the Income Tax Law which determines the method of ascertaining the gain or profit derived from the *exchange of property* and which, under the 1918 act, dealt with in Schoenheit v. Lucas, supra, provided in section 202 (b), 40 Stat. 1060: "When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any."

And as there said, page 478 of 44 F.(2d), by Judge Soper: "Section 202 (b) lays down the rule applicable to the exchange of property and makes it necessary to determine the fair market value, if any, of the property received."

But the question here arises, not under that section of the Income Tax Law but under section 22 of the Revenue Act of 1928

(26 USCA § 2022), which provides: "'Gross income' includes. gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, * * * or gains, or profits and income derived from any source whatever."

The applicable regulation of the Treasury Department provides: "Article 53. *Compensation paid other than in cash.* Where services are paid for with something other than money, the fair market value of the thing taken in payment is the amount to be included as income. If the services were rendered at a stipulated price, in the absence of evidence to the contrary, such price will be presumed to be fair value of the compensation received. Compensation paid an employe of a corporation in its stock is to be treated as if the corporation sold the stock for its market value and paid the employe in cash."

The proposition urged by counsel for the taxpayers is that the regulations must be treated as *limitations* narrowing the comprehensive scope and effect of the requirements of the *law* itself. And they say, as there was no fair market value for the stock its value although otherwise ascertainable is not to be included as an item of gross income. The decision of the Third Circuit Court of Appeals in Nichols v. Commissioner, supra, apparently does support this view. But the contrary has been later held in Crowell v. Commissioner (C. C. A. 6) 62 F.(2d) 51, 52, and Old Colony Trust Co. v. Commissioner (C. C. A. 1) 59 F.(2d) 168.

In the Crowell Case $6,000 par value of stock of a corporation was issued to an officer for services, and the court said: "It would seem clear from the terms of the statute that stock received by way of salary, if it has value, is income, taxable in the year received. The Treasury Department, however, by Regulation 62, Article 33 [under the Revenue Act of 1921], set up a formula by which the value of such stock is to be determined. In so far as applicable it is printed in the margin. [It is similar to Article 74 of the Regulations above quoted except that it also included the qualifying phrase in the first sentence—'if readily ascertainable.'] It is argued from this that stock received as compensation for personal service is taxable in the year received only if (1) it has a market value, and (2) if that market value is readily realizable, and that if no market exists, or if the fair market value is not readily realizable, no taxable income results from its receipt. We think this position cannot be sustained. The mandate of section 213 (a) of the act which requires inclusion in gross income of all compensation in whatever form paid, is clear and unambiguous. The only purpose of a regulation in respect to it is to provide a reasonable method whereby the value of property received as compensation may be fairly determined. This, Regulation 62 purports to do. It must be read, however, in the light of the act, and so read any seeming confusion of its terms is at once resolved. Readily realizable market value may well be considered the best, if not a conclusive, measure of value. If such standard of value exists, it is, under the regulation, to be applied. It is not, however, an exclusive standard, the nonexistence of which compels a determination of no value."

The opinion, moreover, distinguishes the case from those arising under the exchange section of the Income Tax Law. A similar distinction between the two sections of the law was made in Old Colony Co. v. Commissioner (C. C. A. 1) 59 F.(2d) 168, 170. There also stock of a corporation was issued to one of its officers for salary under conditions where there was no established market value. The court said: "Where the fair market value of property received in compensation of services is not readily realizable, as where there have been no sales under conditions that can be held to determine its fair market value, Chicago Ry. Equipment Co. v. Blair (C. C. A.) 20 F.(2d) 10, 13, 14, then the Board may take into consideration in determining the income the other measures fixed in article 33: (1) The stipulated price at which the services were rendered; or (2) in the case of the payment by a corporation in its own stock, the fair market value of that stock, that is, what one under no compulsion to sell can obtain in a reasonable time from a person willing, desirous and able to buy. * * * It is not essential that there be a sale to determine the fair market value of the stock of a corporation. The nature of its business, and the other elements that go to make up the value of the stock to a purchaser who is willing and desirous of buying, may be considered. It is a question of the sound judgment of the Board of Tax Appeals."

As these two cases are more recent than the case to the contrary in the Third Circuit, I feel obliged as a matter of law to follow the conclusions reached in them. And in my opinion the reasons advanced, particularly in the Crowell Case, are convincing and compelling to the conclusions reached. The contrary conclusion would tend to the promotion of evasion or at least postponement of in-

come taxes (although it is certainly clear that the taxpayers in this case acted in perfect good faith and on what they believed to be their legal rights). The language of the section of the law defining gross income shows a very clear intention of Congress to comprehensively grasp and include all sources of income in whatever form realized. It would be unreasonable to interpret the regulations as intended to narrow the scope of the all-inclusive definition of the law. The purpose of the Income Tax Law clearly is to provide income for government expenditures. The whole plan of the law is also put upon an annual basis. It would tend to defeat the obvious fiscal policy of the government to permit a construction of the definition which would have the effect of disturbing the regularity of receipts of income for services annually performed. The accounting by the individual taxpayer is annual. While he may keep his accounts on the cash or accrual basis, he clearly must make an annual return on one basis or the other and to the extent that his income is derived from a partnership, his distributive share of the net income thereof must be included in his individual return whether actually distributed by the corporation or not; and it is taxable for the year when earned by the partnership. 26 USCA § 2183; Louis M. Bourne v. Commissioner (C. C. A. 4) 62 F.(2d) 648.

It is also an alternative or subordinate contention of counsel for the taxpayers that the value of the stock as determined by the Commissioner is excessive. Counsel for the defendant contend that this issue is not open for review because not included within the reasons given by the taxpayers in their petitions for refund. See United States v. Felt, 283 U. S. 269, 51 S. Ct. 376, 75 L. Ed. 1025. I do not think this contention should be sustained. It is true that the main contention advanced by the taxpayers throughout the controversy and in their petitions for refund is that the stock was not taxable at all because it had no fair market value, but included in the petition for refund were references to letters written by the taxpayers to the Department which I think fairly raised the subordinate question of the proper valuation. In my opinion the reasons assigned in the petition for refund should not be narrowly construed in view of the undoubted complications affecting the administration of the Income Tax Law with the details of which the taxpayer is in fact not always familiar. Whether the plaintiffs' contention on this point is fairly included in the declarations in the suits is not so clear. But no objection as to that has been made by defendant's counsel, and if made could readily be met by amendment.

The Commissioner valued the stock at $85.71 per share or at $60,000 for $70,000 par value. An important although not exclusive consideration apparently actuating the Commissioner in reaching this valuation was that the ordinarily prevailing rate of compensation for architects was 6 per cent. on the cost of the building. Mr. Nolting testified that in this case the rate was fixed at 7 per cent. instead of 6 per cent., in view of his willingness to accept the stock which he thought would be of a speculative actual value.

■ It is, of course, well settled that the determination of the Commissioner is prima facie correct and the burden of proof is on the taxpayer to show the contrary. Wright v. Commissioner (C. C. A. 4) 50 F.(2d) 727. The question in this case is whether the testimony as a whole is sufficient to show that the valuation as determined by the Commissioner is wrong. The question is not without difficulty. The fair value of a corporate stock as of any given time where there is no established market value is nearly always a difficult problem. Where the law does not imperatively require the determination of value from market value alone, there is no exclusive test or measure of actual value. It may be said here as in Ray Copper Co. v. United States, 268 U. S. 373, 377, 45 S. Ct. 526, 528, 69 L. Ed. 1003: "As the method to be pursued in ascertaining the value is not prescribed, we think that it was left to the sound judgment and discretion of the Commissioner, subject only to the obligation to take into consideration every relevant fact."

Of course the determination of the Commissioner is subject to review if the taxpayer meets the burden of proof required. Considering all the relevant facts disclosed in the testimony in this case as bearing on the actual value of this stock, I have not been able to reach the conclusion that the testimony as a whole establishes by a preponderance of the evidence that the valuation as fixed by the Commissioner was wrong. The situation must be viewed in the light of the conditions existing in December, 1928, when the stock was received by the partnership, with such additional facts, not too remote in their origin arising thereafter, as may fairly be regarded as natural consequences of the conditions existing in 1928, with regard to the stock. While it is true, I think, that the subscriptions of the promoters of the enterprise to

the preferred stock were actuated by such special considerations that of themselves they did not fairly establish a market value for the stock, yet it is not possible to entirely ignore the fact that very many customers of the bankers did buy in the aggregate a very substantial amount of this preferred stock at par. It is possible to view these purchases as themselves constituting, in some sense at least, a market value for the stock although hardly to be so regarded if by "fair market value" is meant a free purchase and sale of stock on a stock exchange or in the open market. It is also not possible to entirely ignore the fact that in addition to the stock subscribed and paid for in services both the architects and the builder subscribed and paid for an additional amount of preferred stock at par, although this was one of the provisions of the original agreement. Then again, the bankers in addition to originally subscribing and paying for $100,000 of preferred stock at par, also subscribed and paid $100,000 for 2,000 shares of the common stock, a junior security. On the other hand, it is utterly improbable that either the architects or the builder would have bought and paid par in cash for this stock as an ordinary investment. And the fact that numerous customers of the bankers did apparently buy and pay for the stock at par, is hardly of itself a fair basis for valuing the stock at par to the architects who took it for services only. They maintain that with them the actuating motive was to keep the office force occupied and trust to the future for their personal compensation. While the bankers were able to sell their own preferred stock to their particular customers they were not willing to undertake to sell stock for the architects. Still again, the ultimate comparative failure of the project is not directly attributable to any fault in the plans or waste of capital assets but to changed economic conditions which were not foreseen by the parties in 1928. And the few scattering sales of the stock made in recent years under changed conditions is no fair test of the value to be determined as of December, 1928. The book value of the stock as of September 30, 1929, was not less than par and the intrinsic value of the property owned by the corporation was more than the par value of its bonds and preferred stock. The plan was not chimerical but devised on lines that had in the past been justified by experience save only in this particular case the principal asset of the corporation, the Warrington Apartments, was in its luxurious features somewhat different from other apartment houses which had proven successful in the past. Granting that for this consideration the ultimate value of the stock was in its nature speculative, yet in the absence of evidence to the contrary, it is not unreasonable to say that the price actually paid for a speculative stock by large numbers of people is a reasonable test of its value. Then again, regulations article 53, above quoted, provides that: "If the services were rendered at a stipulated price, in the absence of evidence to the contrary, such price will be presumed to be the fair value of the compensation received."

I cannot say that it was unreasonable for the Commissioner to view the transaction in the light of the services performed by the taxpayers having been rendered at what in substance to them was equivalent to $60,000. That would have been their ordinary fee for a similar project. And even if the facts did not bring the case literally within the language of this sentence of the regulations it would seem to be harmonious with the spirit of the regulations as a whole.

The case is undoubtedly a hard one for the taxpayers. In addition to an actual cost to them of approximately $17,500, they have been obliged to pay income taxes of approximately $8,000 more and have for their total services a stock which at the present time is of little value. But these considerations, real as they undoubtedly are to the taxpayers, can have little weight in the judicial determination of the question in issue where the actual text and judicial construction and application of the Income Tax Law are controlling. It is a familiar legal adage that hard cases make bad law, and the admonition of this adage must be observed by a judge even when sitting as a jury in the determination of value for income tax purposes. Nevertheless I have carefully weighed the testimony to determine whether as a whole it is susceptible of a conclusion which would rationally justify a valuation of the stock at a sum less than that fixed by the Commissioner. While the testimony might possibly have justified a valuation of even par for this stock by the Commissioner, it does not necessarily follow that the judicial judgment as to what is the fair value would require the determination of the value as par in this case. Very likely the Commissioner in fixing the value was actuated by the desire to adopt as the measure a sum less than par which would be consistent with a rational basis of determination both in the interests of the government and of the taxpayers. If the testimony in this case were such that I could find that the taxpayers' stock could and would have been sold by them at a figure less

than that determined by the Commissioner, I should adopt that lower figure because I think it consistent with the spirit of both the law and the regulations, and particularly the latter that the realizable value of the stock to the taxpayer in a case of this kind is the best test of real value, although not the only one. But the testimony fails to establish such a lower figure for the stock. The burden of proof is on the taxpayer to establish the lower value and the impression left upon me as a result of all the testimony is that it is by no means clear that the taxpayers would have been willing vendors of the stock in December, 1928, at a figure less than that fixed by the Commissioner.

On the whole, therefore, I conclude that the plaintiffs have not met the burden of proof required of them to show that the valuation as fixed by the Commissioner was too high.

What has been said with regard to the valuation of the stock received by the partnership in 1928 is on the whole substantially applicable to the additional 50 shares received by them in 1929 and requires a similar ruling.

Another contention advanced by the taxpayers' counsel was that because, as they contend, under the custom affecting architects' commissions, they are payable in installments from time to time as their work progresses, and as 60 per cent. of their work had been done and an equivalent amount of stock was reasonably demandable by them in the early part of 1928, the value must be determined as of that date and at that time they contend it was even clearer that the stock had no market or readily ascertainable value. But I think the contention is not maintainable. In legal contemplation the stock was not earned directly by the individual taxpayers but came to them through the partnership, the fiscal year of which ended December 31. And the stock was not actually received by the partnership and indeed no account was rendered or demand made therefor by the partnership until that time. The fact that the stock might properly have been distributed to the partners at an earlier date in the year if it had been earlier received, is immaterial.

A somewhat similar contention mentioned but apparently not seriously pressed was that a portion of the stock had really been earned by the partnership in 1927 and, therefore, if taxable at all should be taxed for that year. But this also I deem untenable for several reasons. While the preliminary contract was executed in October, 1927, and the corpora-

tion formed in the latter part of November, 1927, the substantial financial organization and corporate proceedings authorizing the issuance of stock did not occur until January, 1928. If the project had been abandoned in 1927 it is utterly improbable that any of the parties would have insisted upon a legal right to compensation in that year even though, as appeared in the testimony, a notation for that year was made in the partnership books to the effect that 290 shares of the stock had been earned. Until 1928 I think the project was entirely too tentative and embryonic to conclude that the prospective stock really represented income to the partnership for 1927. But however that may be, the petition for refund is not broad enough in the reasons assigned to have included a revamping of the taxpayers' returns by allocating some part of the stock to the taxable year of 1927.

At the request of the defendant, I have made rulings on specific propositions of law which his counsel have requested, and have filed the same with the clerk. Plaintiffs' counsel have not requested any specific rulings. Exceptions on behalf of each party are noted to the adverse rulings.

Under the conclusions reached, the verdict is for the defendant in each case, and the clerk is instructed to enter the same accordingly. I have endeavored to discuss both the law and the facts in this case quite fully with a view to giving the plaintiffs, in the event of an appeal, the widest permissible scope for review of my decision.